139 P.3d 320 (2006)
157 Wash.2d 358
In re the Matter of the Personal Restraint of Richard J. DYER, Petitioner.
No. 76730-1.
Supreme Court of Washington, En Banc.
Argued November 10, 2005.
Decided July 27, 2006.
David Zuckerman, Seattle, for Petitioner/Appellant.
Gregory Joseph Rosen, Attorney General's Office, Criminal Justice Division, William Berggren Collins, Olympia, for Appellee/Respondent.
*321 C. JOHNSON, J.
¶ 1 This case requires the court to determine whether the Indeterminate Sentence Review Board (ISRB) abused its discretion when it determined that Richard J. Dyer was not parolable. The ISRB has broad discretion in making parolability decisions, but this discretion does not enable the ISRB to disregard the evidence presented at the hearing and base a decision on speculation and conjecture unsupported by evidence in the record. We hold the ISRB abused its discretion in determining that Dyer was not parolable and therefore do not reach Dyer's claims that the ISRB violated his constitutional rights. We reverse the decision of the ISRB and remand to the ISRB.

FACTS
¶ 2 Dyer was convicted by a jury of first degree rape of two individuals. Resp. of ISRB, Ex. (hereinafter ISRB Ex.) 2, at 1. On February 19, 1982, the sentencing court imposed a maximum term of life imprisonment for each count, with the sentences running concurrently.[1] Under the indeterminate sentence system, the ISRB makes the decision regarding the duration of confinement. In making this decision, the ISRB must "consider the purposes, standards, and sentencing ranges adopted pursuant to RCW 9.94A.850 [the Sentencing Reform Act of 1981(SRA)] and the minimum term recommendations of the sentencing judge and prosecuting attorney ...." RCW 9.95.009(2).
¶ 3 The SRA directs that "[w]hen making decisions on duration of confinement, . . . the board shall . . . attempt to make decisions reasonably consistent with [the SRA] ranges, standards, purposes, and recommendations." RCW 9.95.009(2). With the exception of sentence enhancements, the SRA ranges do not increase or decrease based on the nature of a particular offense. In establishing standard range sentences, the SRA takes into account the uniform seriousness level of the current offense and the defendant's offender score. RCW 9.94A.530(1). Consistent with SRA guidelines and directives, the ISRB imposed an exceptional minimum term of 240 months on September 15, 1986, departing from the SRA guidelines of 66-88 months because "the commission of the offense manifested deliberate cruelty . . . ."[2] ISRB Ex. 4, at 1.
¶ 4 The ISRB considered Dyer for parole under RCW 9.95.100 in 1995, 1998, and 2002. On each occasion, the ISRB denied parole and extended Dyer's minimum term by 60 months. The record shows that during his prison term, Dyer has participated in the following offender change programs: anger/stress management, victim awareness, nonviolent conflict resolution, moral recantation therapy, and industrial safety. Opening Br. of Pet'r, App. (hereinafter Pet'r App.) F at 1. However, Dyer has not been permitted to enter the sex offender therapy program because he denies committing the rapes for which he was convicted.
¶ 5 The challenge in this case concerns the ISRB's hearing in 2001 and decision on January 30, 2002. In preparation for the ISRB's 2001 hearing to evaluate Dyer's parolability, Carson E. Carter, a Washington State Department of Corrections (DOC) licensed mental health counselor, conducted a psychological evaluation of Dyer at the ISRB's request. Carter has substantial experience administering tests relating to risk, and evaluating and counseling persons committed as sexually violent predators. Pet'r App. I at 1. Carter evaluated Dyer's criminal behavior, social history, current behavior and functioning, and sexual behavior, and conducted a clinical interview and administered several psychological tests.[3] In his evaluation, Carter reported *322 that "[h]is scores are typical of sex offenders who present a low risk to reoffend," and concluded, "[i]f we are gauging risk, he has met the criterion for a less restrictive environment." Pet'r App. E at 3-4.
¶ 6 During the hearing on December 4, 2001, Dyer's parolability was again evaluated. Pet'r App. H. Carter was not present, but John Austin, the chair of the ISRB, repeatedly assured Dyer and his attorney that the ISRB accepted Carter's credentials, and the evaluation was admitted as evidence. Pet'r App. H at 2, 3, 10. Dyer's counselor, Larry Cook, testified that Dyer worked as a recreational assistant and received exemplary work reports from all the recreation supervisors. He noted that "everything about his attitude and behavior in the unit has been exemplary" and confirmed Dyer's family support. Cook reported that Dyer "completed all the available offender change programs that are available here at McNeil Island" and that to his knowledge, Dyer had never refused any counseling offered to him. Pet'r App. H at 5-7.
¶ 7 In addition to Dyer's testimony and his attorney's arguments, the members of the ISRB discussed their perceptions of Dyer's situation. Austin stated he would not hold Dyer's denial of guilt against him,
I'm not going to hold somebody just because they deny it, because every [sic] I read about sexual offenders is denial is not what's called a risk factor, it's not used in these various instruments that your counselor has mentioned. Denial per se is not itself a risk factor so I don't use it to hold it against somebody ... I don't hold his denial against him, and I don't consider him manipulative. I accept your sincerity, Mr. Dyer.
Pet'r App. H at 14, 22. Instead, Austin was concerned with Dyer's good behavior in prison, which he viewed as consistent with "the calculating nature of the behavior" during the rapes. Pet'r App. H at 15. He said, "I expect you to exhibit that controlled behavior, because that's what's shown in the rapes," but also acknowledged, "[i]t's a catch-22 irony. Because a person who is innocent and has been dealt a bad hand is going to try to figure a way to play the best he can, and it's quite obvious that you made an accommodation for prison life." Pet'r App. H at 15-16. The ISRB issued its report and decision denying parole to Dyer on January 30, 2002. The ISRB stated, "[a] central difficulty for the Board is that Mr. Dyer remains an untreated sex offender." ISRB Ex. 11, at 3. The ISRB continued, "[m]ore serious and significant to the Board is that these particular types of rape appear to be in reaction to stress." ISRB Ex 11, at 3. He "shows that he is an orderly person, careful in his work and is able to maintain himself within the institution ..., precisely the behavior demonstrated in the crimes." ISRB Ex. 11, at 3. The ISRB concluded, "[t]hus Mr. Dyer, for the Board, is an untreated sex offender with behaviors that are apparently motivated when he is in a period of stress." ISRB Ex. 11, at 3. The ISRB conceded Dyer's risk of reoffense "[a]ppears to have been ameliorated in current psychological tests," but stated "[o]f concern to the Board is the ability to learn how to take psychological tests." ISRB Ex. 11, at 4.
¶ 8 The ISRB concluded that Dyer was not parolable and extended his minimum term by 60 months. In reaching this conclusion, the ISRB stated that it considered the materials in Dyer's file, including previous ISRB decisions, file materials of the Department of Corrections, and earlier psychological evaluations, which provided the basis for denying parole in Dyer's prior hearings.

ANALYSIS
¶ 9 The decision of whether to parole a prisoner "may be made for a variety of reasons and often involves no more than informed predictions as to what would best serve correctional purposes or the safety and welfare of the inmate. The decision turns on a `discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done.'" Greenholtz v. Inmates of the Neb. Penal & Corr. Complex, 442 U.S. 1, 10, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (quoting Sanford H. Kadish, The Advocate and the ExpertCounsel in the Peno-Correctional Process, 45 Minn. L.Rev. *323 803, 813 (1961)). We review parole eligibility decisions to ensure the ISRB exercises its discretion in accordance with the applicable statutes and rules. The ISRB abuses its discretion when it fails to follow its own procedural rules for parolability hearings or acts without consideration of and in disregard of the facts. In re Pers. Restraint of Addleman, 151 Wash.2d 769, 776-77, 92 P.3d 221 (2004).
¶ 10 The legislature requires the ISRB to "attempt to make decisions reasonably consistent with [the SRA] ranges, standards, purposes, and recommendations [of the sentencing judge and prosecuting attorney]" and "give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole." RCW 9.95.009(2), (3). In making its decision on an inmate's parolability, the ISRB is guided by WAC 381-60-160, which provides:
The board panel shall render a decision of either parolable or not parolable on each case heard under this chapter ...
Examples of adequate reasons for a finding of nonparolability include, but are not limited to:
1. Active refusal to participate in available program or resources designed to assist an offender to reduce the risk of reoffense (e.g., anger management, substance abuse treatment).
2. Serious and repetitive disciplinary infractions during incarceration.
3. Evidence of an inmate's continuing intent or propensity to engage in illegal activity (e.g., victim harassment, criminal conduct while incarcerated, continued use of illegal substances).
4. Statements or declarations by the inmate that he or she intends to re-offend or does not intend to comply with conditions of parole.
5. Evidence that an inmate presents a substantial danger to the community if released.
¶ 11 Although this list of reasons that may support an ISRB finding of nonparolability is not exhaustive, the list should guide the ISRB's decisions. In the present case, the record from the hearing does not support any of these factors.[4] Dyer does not actively refuse to participate in available programs or resources designed to assist him reduce his risk of reoffense. Rather, Dyer participated in several offender change programs. He does not actively refuse to participate in the sex offender treatment programs; rather he is rendered ineligible for treatment in that program because he denies his guilt. The record does not reflect that Dyer has serious and repetitive disciplinary infractions but instead shows that he maintains good behavior in prison. He does not engage in criminal conduct in prison and states that he will maintain lawful behavior if released. Previous psychological evaluations indicating he posed a risk of reoffending do not constitute evidence that he currently presents a substantial danger to the community if released. His current psychological report shows that he poses little danger to the community if paroled.
¶ 12 The inmate bears the burden of establishing his parolability. In turn, the ISRB must base its decision on the evidence presented at the hearing. In this case, in reaching its conclusion that Dyer is not parolable, the ISRB disregarded the evidence presented, including his most recent psychological evaluation. The ISRB stated that it relied on objective evidence, including "previous Board dictations, file materials of the Department of Corrections and the ISRB, the interview with Dyer, and arguments of his counsel." ISRB Ex. 11, at 4. Though the ISRB states that it considered this material, the ISRB's decision gives no indication that the evidence in the file supported its decision or that the evidence was used to refute any new evidence presented at the hearing. Instead, the ISRB's decision is primarily supported by speculation and conjecture suggesting that Dyer is manipulative, poses a high risk to reoffend, and had the ability to *324 learn how to take psychological tests. The ISRB also relied on the unchangeable circumstances of Dyer's crimes, the same facts that justified the imposition of Dyer's original exceptional sentence.
¶ 13 Though the regulations do not explicitly require the ISRB to consider psychological evaluations, the ISRB consistently obtains the reports and relies on them for its decisions on prisoners' parolability. For example, the ISRB has relied on psychological screening and tests in other cases to find a prisoner not parolable because he "presents too great a risk to be released to the community at this time." In re Addleman, 151 Wash.2d at 778, 92 P.3d 221 ("Those tests and the psychologist suggest that Addleman presents a high risk of committing another violent offense within six months after release.").
¶ 14 When the ISRB disregards current psychological reports and evaluations and gives significant weight only to previous evaluations that support a finding that an inmate is not parolable without making findings to support that approach, the ISRB fails to follow the procedures outlined by the WAC regulations. Here, the ISRB relied substantially on evaluations in each of its prior parole decisions regarding Dyer. In its 2002 decision at issue in this case, the ISRB stated that "psychological data in the file from the early 1990s indicated a relatively high reoffense risk," but acknowledged that "[t]his risk appears to have been ameliorated in current psychological tests." ISRB Ex. 11, at 4. The ISRB nonetheless concluded Dyer is an untreated sex offender and denied him parole. ISRB Ex. 11, at 1.
¶ 15 The evidence presented to the ISRB supports the argument that Dyer currently poses a low risk of reoffending. Dyer's December 2001 psychological evaluation contradicts the ISRB's conclusion that Dyer is not rehabilitated and poses a high risk to reoffend. In his evaluation, Carter reported that "the instruments that typically predict recidivism indicate [Dyer] is a low risk to reoffend...."[5] Pet'r App. E at 4. He found that Dyer "is prepared to take his place in society as a productive citizen" because he has "a legitimate home address, realistic plans for the future, and employable skills." ISRB Ex. E at 4. Carter concluded that Dyer "could be considered for community supervision with less concern for the community than many of the offenders who are released into society." Pet'r App. E at 4.
¶ 16 With respect to Dyer's earlier evaluation of PTSD, Carter reported, "Mr. Dyer suffers from no serious mental illness, but he does suffer the lingering effects of PTSD, much like many war veterans." Pet'r App. E at 2. The ISRB questioned Dyer about his PTSD diagnosis during his parolability hearing, and Dyer responded openly about his enduring nightmares of his service in Vietnam, where 9 of his 12 unit members were killed. He acknowledged that he may have anxiety attacks and that "something will trigger it, like the helicopters going over," but explained, "I've learned that I've got it." Pet'r App. G at 19. Dyer reported that after he was diagnosed with PTSD, he participated in programs relating to victim awareness, alternatives to violence, and moral recantation therapy and worked as a facilitator for stress anger management "for most of [the programs]." Pet'r App. G at 11. He stated he had contacted several programs, "clinics in house and out of house" in Seattle, Spokane, and Oklahoma (where his family resides) and prepared paperwork to enter the programs in case he was paroled. He also indicated he started a group at the reformatory for combat veterans suffering from PTSD. Pet'r App. G at 19.
¶ 17 Despite the evidence that Dyer has a low risk of reoffending and an ability to adequately readjust to life outside prison, the ISRB's decision evidently ignored Dyer's evidence and rejected the value of Carter's evaluation because of the ISRB's concern with Dyer's "ability to learn how to take psychological tests." ISRB Ex. 11, at 4. Nothing in the record supports a conclusion that Dyer *325 has learned how to manipulate tests.[6] Since the record provides no support for this concern, the ISRB relied on the nature of Dyer's underlying criminal behavior, which it contended evidenced a "high level of manipulation and sophistication." ISRB Ex. 11, at 4. Evidently, the ISRB believed the manipulation and sophistication were illustrated by the facts which supported his convictions. ISRB Ex. 11, at 3. Objectively, nothing exists in the record to support this conclusion, other than conjecture. The nature of his crimes does not necessarily support the ISRB's conclusion that Dyer recently learned how to take psychological evaluations. The record reflects the psychological tests are administered by Washington State Department of Corrections psychologists and licensed mental health counselors, based on objective factors, and specifically designed to prevent manipulation by the offender. Neither the record nor the nature of Dyer's crimes supports the ISRB's suggestion that Dyer could have manipulated Carter's psychological evaluation.
¶ 18 In addition to disregarding the favorable psychological evidence, the ISRB focused substantially on the unchangeable circumstances of Dyer's crimes, which occurred in 1980. Despite its statutory mandate to consider whether a prisoner demonstrates his rehabilitation is complete, the ISRB dismissed evidence of Dyer's rehabilitation in prison evidently based on the facts of his underlying crimes. The ISRB disregarded the fact that Dyer participated in offender change programming and assumed his good behavior in prison is motivated by manipulation, again with nothing in the record to support this conclusion. The ISRB also suggested that if Dyer were released, he "[w]ould encounter far more stresses than he may now, having accommodated to his life in the institution." ISRB Ex. 11, at 3-4. The ISRB stated that "[i]t's the potential reaction to that stress that is of significant concern to the Board as a trigger to more attacks." ISRB Ex. 11, at 4. Again, this statement is unsupported by the evidence in the record and is undermined by Dyer's participation in offender change programming and commitment to obtaining PTSD treatment outside of prison. The ISRB's reliance on the nature of Dyer's crimes and disregard of evidence of Dyer's rehabilitation conflicts with its statutory responsibility to consider the evidence presented in determining whether a prisoner has established he is rehabilitated.

CONCLUSION
¶ 19 The ISRB ignored favorable evidence from psychological evaluations; though the ISRB is not required to consider them, the ISRB consistently relies on these evaluations in making parolability decisions. The ISRB based its decision on unsupported notions that Dyer manipulated the psychological evaluations and poses a high risk of reoffense because of his good behavior in prison and the nature of his crimes. The ISRB possesses broad discretion in determining parolability, but this discretion is not without limits. The ISRB cannot ignore the evidence presented at the hearing nor rely on mere conjecture in making its decisions. Where the ISRB disregards the evidence presented and supports its decision with speculation and conjecture, it abuses its discretion.
¶ 20 In his personal restraint petition, Dyer requests that the court order the ISRB to find him parolable, or at least conditionally parolable to a mutual agreement program. In the alternative, Dyer asks the court to remand with instructions to hold a new parole hearing.
¶ 21 While a review of the evidence and testimony presented at the parolability hearing suggests Dyer met his burden to have conditions of release on parole established, we cannot make this decision in the first instance. We instead remand to the ISRB for a new parolability hearing during which the ISRB must make its determination based on the evidence and testimony presented, and not on speculation and conjecture.
*326 Concurring: ALEXANDER, C.J., SANDERS, CHAMBERS, J.M. JOHNSON, JJ.
FAIRHURST, J. (dissenting).
¶ 22 Today this court takes the unprecedented step of substituting its discretion for the authority of the Indeterminate Sentence Review Board (ISRB) and ordering the ISRB to reconsider evidence that it already considered. The legislature directs the ISRB to release a prisoner only when he has been "rehabilitated." The ISRB complied with this directive and determined it could not release Richard J. Dyer because he was an untreated sex offender and, thus, was not rehabilitated. Because the majority's decision would allow any prisoner to challenge the ISRB's factual determinations without any valid basis for doing so, I would hold that the ISRB did not abuse its discretion and affirm the Court of Appeals. Accordingly, I dissent.

FACTS
¶ 23 The underlying facts of Dyer's crimes are heinous and relevant to the determination of his parolability because the ISRB has the duty to "thoroughly inform itself as to the facts of such convicted person's crime." RCW 9.95.170. In 1982, a jury convicted Dyer of two counts of first degree rape of two individuals, Ms. A and Ms. B. Resp. of the ISRB Exs. (Ex.); State v. Dyer, noted at 38 Wash.App. 1045, 1984 Wash.App. LEXIS (1984); Ex. 2, at 1. On January 27, 1980, Ms. A accepted a ride from Dyer and another man in Bremerton. The men drove Ms. A to a remote location, where Dyer undressed her and raped her. Dyer then tied Ms. A up with a rope and forced her to lie naked on the floor of the car while he drove to a house. Once inside the house, Dyer taped cotton balls over Ms. A 's eyes. Ms. A 's hands and feet were tied to a bed with ropes that were already there. After the other man left, Dyer applied contraceptive foam to Ms. A and raped her again. He proceeded to rape Ms. A throughout the night, at one point turning her from her back to her stomach and raping her in the new position. In the morning, Dyer bathed Ms. A and dressed her in her clothes, which he had laundered. He then drove Ms. A to a remote area and released her.
¶ 24 The second incident occurred on August 23, 1980, when Dyer and another man forced Ms. B into a car while she was walking alone in downtown Bremerton. During the drive, Dyer stopped the car and taped cotton balls over Ms. B's eyes. Dyer took Ms. B to a house, where her hands and feet were tied to a bed. After the other man left, Dyer applied contraceptive foam to Ms. B and raped her repeatedly, at one point turning her from her back to her stomach and raping her in the new position. The next morning, Dyer bathed Ms. B and dressed her in clothes he had laundered. He then drove Ms. B to a remote area and released her. Before releasing her, Dyer gave Ms. B a Timex watch, which Ms. A later identified as the watch she lost while struggling in her rapist's car.[1]
*327 ¶ 25 A jury convicted Dyer of two counts of first degree rape in the incidents involving Ms. A and Ms. B. On February 19, 1982, the sentencing court imposed a maximum term of life imprisonment for each count, with the sentences running concurrently. Dyer challenged his convictions on direct appeal and the Court of Appeals affirmed his convictions. In a February 20, 1982, letter to the ISRB (then the Board of Prison Terms and Paroles), the sentencing judge recommended that Dyer "should be held in custody until the parole board is absolutely sure that he will not reoffend or until the end of his natural life whichever should first occur." Ex. 4, at 2. The prosecuting attorney recommended a minimum sentence of 50 years. Although the ISRB originally set Dyer's minimum term at 600 months, in 1986, the ISRB reduced Dyer's minimum term to 240 months, in light of the then-recently adopted Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, guidelines and the reversal of the two convictions involving Dyer's ex-wife. The ISRB justified the 240 month minimum term, which exceeded the standard SRA range of 63 to 88 months because of the trial judge's and the prosecuting attorney's recommendations and because Dyer's crimes manifested deliberate cruelty.
¶ 26 In 1994, the ISRB found Dyer not parolable, in part based on a 1993 psychological evaluation that found that Dyer's risk of reoffense was "very high," and his depth of sexual deviancy was "high." Ex. 5, at 3. In 1995, the ISRB found Dyer not parolable and added 60 months to his minimum term. The ISRB based its decision in part on a 1994 psychological evaluation diagnosing Dyer with posttraumatic stress disorder and sexual sadism and concluding that "without treatment, the risk of reoffense remains high." Ex. 6, at 3. The ISRB noted that "Mr. Dyer is an untreated, convicted rapist who denies his culpability and is therefore not amenable or receptive to treatment." Id. In 1998, the ISRB again found Dyer not parolable and added 60 months to his minimum term.
¶ 27 Prior to Dyer's 2002 parole hearing, licensed mental health counselor Carson Carter conducted a new psychological evaluation of Dyer. Carter reported that Dyer received low scores on the Minnesota Sex Offender Screening ToolRevised (MnSOST-R), the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), and the Hare Psychopath ChecklistRevised (PCL-R). Carter concluded that these scores indicated a low risk to reoffend, and that Dyer had "met the criterion for a less restrictive environment." Mot. for Discretionary Review, App. E at 4.
¶ 28 In 2002, the ISRB again found Dyer not parolable and added 60 months to his minimum term. The ISRB stated that "[a] central difficulty for the Board is that Mr. Dyer remains an untreated sex offender." Ex. 11, at 3. The ISRB also cited a concern that Dyer's criminal behavior might be "in reaction to stress," as indicated in "extensive file material." Id. The ISRB considered evidence that Dyer was "an orderly person, careful in his work" but also acknowledged that "calculation" was "precisely the behavior demonstrated in the crimes." Id. The ISRB recognized that the risk of reoffense "appears to have been ameliorated in current psychological tests" but noted that Dyer might have learned how to take psychological tests. Id. at 4. Taking all of these factors into account, the ISRB found that Dyer was "not rehabilitated" and not fit to be released. Id.

ANALYSIS
¶ 29 In reviewing an ISRB decision, this court must determine whether the ISRB abused its discretion in concluding that a prisoner has not established that he is parolable. In re Pers. Restraint of Ecklund, 139 Wash.2d 166, 174, 985 P.2d 342 (1999). Thus, it is the prisoner's burden to establish that he is parolable. Id. Almost exclusively, this court has found that the ISRB abuses its discretion when it fails to follow its own procedural rules for parolability hearings. RAP 16.4(c)(2), (6); In re Pers. Restraint of *328 Cashaw, 123 Wash.2d 138, 149-50, 866 P.2d 8 (1994) (the ISRB abused its discretion by failing to give Cashaw notice and an in-person hearing before extending his minimum term). Neither Dyer nor the majority identifies how the ISRB failed to follow its own procedural rules.
¶ 30 The majority maintains that the ISRB also abuses its discretion when it "acts without consideration of and in disregard of the facts." Majority at 323. This court did consider this argument in In re Personal Restraint of Addleman, 151 Wash.2d 769, 777, 92 P.3d 221 (2004), where we held that Addleman failed to meet his burden of proving that the ISRB acted "`without consideration of and in disregard of the facts'" because "there was ample evidence supporting the ISRB's conclusion that Addleman was not rehabilitated and evidence to the contrary was duly considered." Id. (quoting Ben-Neth v. Indeterminate Sentence Review Bd., 49 Wash.App. 39, 42, 740 P.2d 855 (1987)). In order to meet his burden of proving that the ISRB acted "without consideration of and in disregard of the facts," Dyer must prove that the ISRB acted "willfully and unreasonably," and its decision was "arbitrary and capricious." Ben-Neth, 49 Wash. App. at 42, 740 P.2d 855; Addleman, 151 Wash.2d at 777, 92 P.3d 221.
¶ 31 Additionally, RCW 9.95.009(2) requires the ISRB to "consider the purposes, standards, and sentencing ranges adopted pursuant to [the SRA] and the minimum term recommendations of the sentencing judge and prosecuting attorney" and to "attempt to make decisions reasonably consistent with those ranges, standards, purposes, and recommendations."[2] However, as this court recognized in Ecklund, that mandate
is modified somewhat by RCW 9.95.009(3), which expressly states that "[n]otwithstanding the provisions of subsection (2) of this section, the indeterminate sentence review board shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole." (Emphasis added.) Moreover, the Legislature has statutorily precluded the Board from releasing a prisoner, prior to the expiration of their maximum term, "unless in its opinion [the prisoner's] rehabilitation has been complete and he is a fit subject for release." RCW 9.95.100.
139 Wash.2d at 174, 985 P.2d 342 (alteration in original). In Addleman, this court clarified that the statutory requirement that the ISRB may not release a prisoner until his rehabilitation is complete trumps the ISRB's duty to attempt consistency with the SRA. 151 Wash.2d at 775, 92 P.3d 221.
¶ 32 After considering these factors, the ISRB is endowed with a great deal of discretion in making parolability determinations and a prisoner is "`subject entirely to the discretion of the Board, which may parole him now or never.'" Ecklund, 139 Wash.2d at 174-75, 985 P.2d 342 (quoting In re Pers. Restraint of Powell, 117 Wash.2d 175, 196, 814 P.2d 635 (1991)). Moreover, this court has held that the ISRB "may redetermine the minimum term [of a prisoner] at its discretion, for a variety of reasons, any time prior to an inmate's completion of his maximum term." State v. King, 130 Wash.2d 517, 528 n. 4, 925 P.2d 606 (1996). This is because a prisoner does not have a liberty interest in his release prior to serving his maximum sentence. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, *329 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979);[3]In re Pers. Restraint of Ayers, 105 Wash.2d 161, 164-66, 713 P.2d 88 (1986).
¶ 33 Dyer bears the burden of proving that the ISRB abused its discretion by extending his minimum term and denying him release. Addleman, 151 Wash.2d at 776, 92 P.3d 221. The majority asserts that the ISRB abused its discretion in two basic waysby not properly considering Carter's psychological evaluation and by relying on the facts of Dyer's convictions.[4]
¶ 34 First, the majority asserts that the ISRB abused its discretion by disregarding Dyer's most recent psychological evaluation and instead basing its decision on "speculation and conjecture." Majority at 323-24. However, as the majority itself recognizes, no regulation requires the ISRB to consider psychological evaluations in making release decisions. Majority at 324. WAC 381-60-160 provides examples of "adequate reasons for a finding of nonparolability," a list which does not include the findings of a psychological evaluation.[5] Before the legislature amended WAC 381-60-160 in 1998, one of the reasons that the ISRB could use to support a finding of nonparolability was "[c]ompelling evidence within a mental health, psychosocial, or psychological report that an inmate presents a substantial danger to the community if released." Former WAC 381-60-160(5) (1991). The amended language that was in effect when the ISRB considered Dyer's parolability in 2002 removes any reference to psychological reports and instead simply reads "[e]vidence that an inmate presents a substantial danger to the community if released." WAC 381-60-160(5). This amendment indicates the legislature's intent to move away from relying on psychological evaluations in parolability hearings.
¶ 35 Because the ISRB's regulations do not require the ISRB to consider psychological evaluations, the ISRB could not have violated its own procedural rules by refusing to base its decision entirely on Carter's psychological *330 evaluation. Moreover, even if the ISRB failed to follow the guidelines in WAC 381-60-160, such a failure would not constitute an abuse of discretion because the regulation clearly provides a set of nonexclusive guidelines, not mandatory requirements. The majority reads the language "[e]xamples of adequate reasons for a finding of nonparolability" in WAC 381-60-160 to mean that "some objective evidence presented at the hearing must support a finding of nonparolability." Majority at 323 n.4. The majority provides absolutely no authority to support this assertion, which erroneously shifts the burden of proof to the ISRB. As noted above, this court has repeatedly recognized that it is the prisoner's burden to establish his parolability. Clearly, one reason the ISRB may use to support a finding of nonparolability is that the prisoner has not met his burden of proving that he is rehabilitated, a reason that is not listed in WAC 381-60-160. Thus, the ISRB could not have abused its discretion by failing to follow the guidelines in that regulation.
¶ 36 Regardless of whether the ISRB was required to consider Dyer's most recent psychological evaluation, the ISRB's written decision clearly reflects that it did consider Dyer's psychological evaluations, including Carter's report. The ISRB's decision states that Dyer's psychological reports "consistently indicate low to medium risk." Ex. 11, at 2. Additionally, the ISRB noted that even though Dyer's evaluations from the early 1990s indicated a relatively high reoffense risk, "this risk appears to have been ameliorated in current psychological tests." Id. at 4. Therefore, the record clearly reflects that the ISRB considered Carter's favorable psychological evaluation as a factor in determining Dyer's parolability. As a result, the ISRB's actions do not constitute an abuse of discretion because the ISRB did not act without consideration of and in disregard of the facts. The ISRB considered Carter's report but declined to base its release decision entirely on one licensed mental health counselor's assessment of Dyer's parolability, a choice that was entirely within their discretion.
¶ 37 The majority also asserts that the ISRB abused its discretion when it expressed its concern that Dyer may have learned how to take psychological tests. Majority at 324-325. The majority maintains that the psychological tests administered to Dyer were based on objective factors that could not be manipulated by the test subject.[6]Id. at 14-15. Additionally, the majority argues that the ISRB abused its discretion by expressing a concern that Dyer might be more likely to reoffend in a more stressful environment than prison. Id. at 15-16. However, nothing precludes the ISRB from considering either of these concerns, nor does the majority explain why expressing these concerns constitutes an abuse of discretion. Rather, the record indicates that the ISRB gave credence to the opinion that Dyer's risk of reoffense may have been ameliorated but found him not parolable because he was an untreated sex offender.
¶ 38 From the ISRB's written decision and reasons, it is also clear that the ISRB voiced these concerns in the effort to resolve inconsistencies in the record. At Dyer's release hearing, Dyer's own attorney acknowledged that there was a "difference" between Carter's report and "previous reports." Mot. for Discretionary Review, App. F at 3. Despite this concern, Dyer failed to subpoena Carter to appear at the hearing, even though Dyer's attorney knew that Carter would not appear without a subpoena. Mot. for Discretionary Review, App. H at 1. At Dyer's hearing, the chair of the ISRB paused the proceeding in the effort to obtain Carter's presence, even though it was not the ISRB's responsibility to do so. Mot. for Discretionary Review, App. G at 2-3. After the ISRB determined that Carter's presence could not be secured, it suggested that Dyer's attorney could submit information about Carter and an offer of proof in writing following the hearing. Id. at 3-4. The subsequent one *331 page letter from Dyer's attorney provided minimal evidence of Carter's experience and did not explain the inconsistencies between Carter's evaluation and Dyer's two previous evaluations, performed by a psychologist 4 who has a Ph.D. and the supervisor of mental health services who has a Ph.D. Mot. for Discretionary Review, App. H at 1.
¶ 39 It was Dyer's burden to establish his parolability. Ecklund, 139 Wash.2d at 174, 985 P.2d 342. As a result, the ISRB did not abuse its discretion by failing to base its release decision entirely on the report of one licensed mental health counselor, particularly when that report conflicted with other evidence in the file and Dyer did not provide any context for the report. Nor was it "speculation and conjecture" for the ISRB to weigh the evidence that Dyer was rehabilitated in Carter's report against other evidence in Dyer's file suggesting that he was not rehabilitated. The majority suggests that the ISRB should have considered only Carter's report in determining whether Dyer posed a risk of reoffending. Majority at 323. However, RCW 9.95.170 provides that the ISRB has a duty to "inform itself as thoroughly as possible as to such convict as a personality." Thus, the ISRB did not abuse its discretion by comparing Carter's report to other evidence in Dyer's file, including previous reports diagnosing him with sexual sadism and extreme denial.
¶ 40 The record at Dyer's release hearing reflects the appropriate degree of skepticism with which the ISRB views psychological evaluations. John Austin, chair of the ISRB, stated the ISRB accepted that "the psychological process" is "imprecise in the prison setting" and that "even the same test scores will vary from examiner to examiner." Mot. for Discretionary Review, App. F at 10. Additionally, the majority lacks any support for its assertion that the psychological tests administered by Carter were "based on objective factors, and specifically designed to prevent manipulation by the offender." Majority at 325. In fact, the literature accompanying the PCL-R, the test on which Carter noted that Dyer received the lowest score he had ever interpreted, states that it is "strongly recommended" that "two or more independent raters" score the test to account for subjective interpretations. Suppl. Br. of Pet'r, Ex. B at 17. The record does not indicate that Carter sought a second opinion on his evaluation. Mot. for Discretionary Review, App. E at 1-5.
¶ 41 Moreover, the two doctors who previously evaluated Dyer in 1993 and 1994 did not administer the tests Carter administered. Ex. 7, at 1-4; Ex. 8, at 1-3. Thus, there was no benchmark against which the ISRB could compare Carter's scores and determine that Dyer was rehabilitated. As a result, the ISRB faced conflicting evaluations. The two previous evaluations diagnosed Dyer with sexual sadism and extreme denial. Ex. 7, at 3-4; Ex. 8, at 2-3. Carter's evaluation did not address those diagnoses but reached the conclusion that Dyer was "a low risk to reoffend" based on test scores.[7] Mot. for Discretionary Review, App. E at 4. Given the conflicting evidence before the ISRB, I would not hold that it abused its discretion by refusing to base its decision entirely on Carter's evaluation.
¶ 42 Although the ISRB generally has broad discretion in determining whether to release a prisoner, the ISRB must determine that a prisoner has been rehabilitated before it may release him. Under RCW 9.95.100, *332 the legislature has statutorily precluded the ISRB from releasing a prisoner prior to the expiration of his maximum term, "unless in its opinion [the prisoner's] rehabilitation has been complete and he or she is a fit subject for release." Additionally, in WAC 381-60-160(1), the first reason listed as a possible justification for a finding of nonparolability is "[a]ctive refusal to participate in available program or resources designed to assist an offender to reduce the risk of reoffense ...." In Ecklund, this court upheld the ISRB's decision not to parole a prisoner because he refused treatment for his alcoholism, despite other evidence of good behavior in prison, including participation in other offender change programs. 139 Wash.2d at 169, 176, 985 P.2d 342. Thus, the majority's contention that Dyer "does not actively refuse to participate in the sex offender treatment programs" is meritless. Majority at 323.
¶ 43 This court should uphold the ISRB's decision not to release Dyer because he has not participated in sex offender treatment. In its written decision, the ISRB noted that Dyer "is an untreated sex offender with behaviors that are apparently motivated when he is in a period of stress." Ex. 11, at 3. The ISRB concluded that "the only responsible decision is to continue to incapacitate Mr. Dyer as not rehabilitated and fit to be released." Id. at 4. The ISRB followed the statutory directives in WAC 381-60-160, which allows the ISRB to deny release based on refusal to participate in a treatment program, and in RCW 9.95.009(3) and .100, which direct the ISRB to give public safety the highest priority and not release a prisoner until he has been rehabilitated. Thus, I cannot say that the ISRB's decision is arbitrary and capricious or that the ISRB acted willfully or unreasonably. Based on the ISRB's statutory directives, I would hold that the ISRB did not abuse its discretion by basing its decision on the fact that Dyer was not rehabilitated because he had not received sex offender treatment.
¶ 44 The majority notes that one of the psychological tests administered by Carter, the MnSOST-R, considered whether the individual has participated in a sex offender treatment program as a factor in calculating Dyer's score. Majority at 324 n. 5. However, Dyer's score on the MnSOST-R is distinct from the determination that he is "rehabilitated," which is what the language of RCW 9.95.100 requires.
¶ 45 In addition to Carter's psychological evaluation, the majority argues that Dyer presented other evidence that he was rehabilitated, specifically evidence of Dyer's good behavior in prison and evidence of Dyer's participation in offender change programs besides sex offender treatment. However, the majority does not indicate that the ISRB acted "without consideration or in disregard of" this evidence and, thus, abused its discretion. Instead, the ISRB's decision reflects that it considered Dyer's entire file, including his good behavior and participation in other offender change programs, but merely gave it less weight than the fact that Dyer remained an untreated sex offender. Ex. 11, at 2-4.
¶ 46 Additionally, while it is true that Dyer has participated in offender change programming while incarcerated, it is also undisputed that Dyer has never received sex offender treatment for his diagnosis of sexual sadism. Dyer's 1993 psychological evaluation, performed by Dr. Riedel, Ph.D., summarized that Dyer's
[r]isk of reoffense is estimated to be high, based on the assumption that the jury convictions are accurate and that Mr. Dyer is currently in a state of denial.
Depth of sexual deviancy is also estimated to be high based on the same assumption and on the fact that any sexual deviancy has remained essentially untreated during his incarceration. It is possible that specialized sexual deviancy evaluation with the use of physiological measurement of deviant sexual arousal patterns may throw further light on this issue.
Ex. 7, at 4. In a 1994 evaluation, Dr. Jones, Ph.D., observed that Dyer's participation in other treatment may have been beneficial, but that "[t]he depth of sexual deviancy cannot truly be assessed with an uncooperative client. Thus, any estimate of this dimension must be based on the actual number and nature of his sexual offenses." Ex. 8, at 3. Because Dyer is a convicted sex offender and *333 diagnosed sexual deviant who has never received sex offender treatment or even admitted that he committed the violent rapes he perpetrated, it was within the ISRB's discretion to find that Dyer was not rehabilitated.
¶ 47 The majority also argues that the ISRB abused its discretion by focusing on "the unchangeable circumstances of Dyer's crimes." Majority at 325. This is not grounds for a finding of an abuse of discretion by the ISRB. The legislature has directed that the ISRB has the duty to "thoroughly inform itself as to the facts of such convicted person's crime." RCW 9.95.170. Thus, the ISRB does not abuse its discretion by following this directive.[8]
¶ 48 Nothing in the record indicates that the ISRB is obstinately refusing to parole Dyer based on the facts of his crimes. The ISRB's decision is rooted in its directive from the legislature not to release Dyer until he has been "rehabilitated," or in other words, until he has completed sex offender treatment.[9]
¶ 49 Additionally, the record does not reflect that the ISRB ignored evidence of Dyer's good behavior in prison or that the ISRB used his good behavior against him. Rather, the record indicates that the ISRB considered Dyer's good behavior but gave it less weight because calculated behavior was "precisely the behavior demonstrated in the crimes." Ex. 11, at 3. The ISRB noted that its "central difficulty" was that Dyer "remains an untreated sex offender." Id. The majority fails to articulate how the ISRB abused its discretion by giving Dyer's good behavior less weight than the fact that he has not received treatment and, thus, is not rehabilitated.
¶ 50 In deciding not to release Dyer, the ISRB did not fail to follow its own procedural rules, nor did it act without consideration or in disregard of any of the relevant evidence. Even though the majority acknowledges that the ISRB was not required to consider Carter's psychological evaluation, the majority bases its conclusion that the ISRB abused its discretion largely on the fact the ISRB considered all of the evidence in Dyer's file rather than blindly following the recommendation of Carter's report. This is evidence that the ISRB properly fulfilled its duty to determine if Dyer was rehabilitated, not evidence that the ISRB abused its discretion.
¶ 51 By remanding Dyer's case to the ISRB for a new parolability hearing, the majority greatly exceeds the bounds of judicial review. This court is not in the position to determine a prisoner's parolability, particularly when this court only received select exhibits provided by the parties and has not reviewed Dyer's entire file. Just as it would have been an abuse of discretion for the ISRB to release Dyer based only on the uncorroborated opinion of one licensed mental health counselor, it is also error for this court to base its decision on that one opinion. If this court truly wants to substitute its judgment for that of the ISRB, then it should order Dyer's entire file and then determine if the ISRB abused its discretion.
¶ 52 In order to support its decision to remand for a new hearing, the majority reweighs select pieces of evidence and concludes that the ISRB abused its discretion simply because the majority believes that the ISRB should have reached a different result. Not only is the majority substituting its discretion for that of the ISRB, it is doing so *334 without the benefit of considering all of the evidence. As a result, I would hold that the ISRB did not abuse its discretion in deciding not to release Dyer and affirm the Court of Appeals.
¶ 53 In addition to arguing that the ISRB abused its discretion, Dyer also asserts six separate claims that the ISRB violated his constitutional rights. I would also hold that these claims have no merit and affirm the Court of Appeals.

CONCLUSION
¶ 54 This court has repeatedly recognized the high degree of discretion afforded to the ISRB and has, up until now, restrained itself from substituting its discretion for that of the ISRB.
[T]he courts are not a super Indeterminate Sentencing Review Board and will not interfere with a Board determination in this area unless the Board is first shown to have abused its discretion in setting a prisoner's discretionary minimum term. In short, the courts will not substitute their discretion for that of the Board.
In re Pers. Restraint of Whitesel, 111 Wash.2d 621, 628, 763 P.2d 199 (1988) (footnote omitted). Moreover, this court typically guards the ISRB's discretion particularly because parole decisions are complicated and risky.
[T]he courts have long recognized ... that, although releasing a convicted felon on parole may be beneficent and rehabilitative and in the long run produce a genuine social benefit, it is also a risky business. The parole may turn loose upon society individuals of the most depraved, sadistic, cruel and ruthless character who may accept parole with no genuine resolve for rehabilitation nor to observe the laws and customs promulgated by the democratic society, which in the process of self-government granted the parole. Thus, recognizing the risky nature of parole as well as its beneficent qualities, the courts have universally held that the granting or denial of parole by the Board of Prison Terms and Paroles rests exclusively within the discretion of the board; that parole is not a right but a mere privilege conferred as an act of grace by the state through its own administrative agency.
January v. Porter, 75 Wash.2d 768, 774, 453 P.2d 876 (1969) (emphasis added).
¶ 55 The ISRB did not abuse its discretion when it determined that Dyer was not parolable because he was an untreated violent sex offender. In making its determination, the ISRB followed its statutory directive to give public safety the highest priority and considered all of the available evidence in making the determination not to release Dyer because he was not "rehabilitated." This court should not step into the shoes of the fact finder and reweigh select evidence that the ISRB has already considered. By doing so, the majority's decision opens the door to any prisoner to challenge an ISRB decision based on nothing more than a mere dispute over how to interpret the facts of his case. This court should exercise restraint and avoid second-guessing the decisions of fact finders who have not abused their discretion, particularly when this court has not had the benefit of considering all of the evidence. I dissent.
Dissenting: BRIDGE, MADSEN, OWENS, JJ.
NOTES
[1] Because Dyer committed the acts underlying his convictions before July 1, 1984, the Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, did not apply to his sentence and he remains under Washington's former indeterminate sentencing system. See RCW 9.94A.905.
[2] The dissent focuses heavily on the nature of the offenses. We recognize the details of the crimes may be relevant to the ISRB's establishment of the offender's minimum term and parolability under the indeterminate sentencing system. But the dissent's emphasis on the facts of Dyer's crimes disregards the legislature's mandate that an offender's confinement under the indeterminate system and the SRA remain reasonably consistent.
[3] The dissent disregards that this professional evaluator considered Dyer's complete file and record of crimes.
[4] While the reasons listed in the WAC that support a finding of nonparolability do not, by their absence, mandate parole, some objective evidence presented at the hearing must support a finding of nonparolability.
[5] This evaluation took into account that Dyer did not admit guilt or participate in a sex offender treatment program. Pet'r App. E at 4.
[6] Dyer participated in the majority of his offender change and treatment programs in 1996, 1997, 1997, and 1999. The 1993 and 1994 psychological evaluations rated his risk of reoffense as high, but the 1998 evaluation rated his risk as low to medium and the 2001 evaluation rated his risk of reoffense as low. ISRB Ex. 10, at 2-3; Pet'r App. E at 3.
[1] At trial, Dyer also faced charges of first degree rape, unlawful imprisonment, and first degree burglary related to two incidents involving his former wife, Ms. W. On October 24, 1980, while Ms. W was separated from Dyer, he pulled her into a back bedroom after she arrived at his home to pick up their child. He undressed her and tied her hands and feet to the bed with ropes that were already there. He had sexual intercourse with her repeatedly throughout the night, at one point flipping her from her back to her stomach. Dyer released Ms. W in the morning.

The second incident occurred on September 2, 1981, after Ms. W and Dyer's dissolution was final. Ms. W awoke to see Dyer standing at the foot of her bed. He bound her hands with duct tape and raped her. Dyer drove Ms. W into the country, took her out of the car, and bound her ankles with a cloth army belt. Dyer then disappeared with a shovel. When he returned, Ms. W persuaded him to take her home. After taking her home, Dyer followed Ms. W inside and raped her again. Afterward, he forced her to take a shower and left.
The counts involving Ms. W were reversed on direct appeal. The Court of Appeals held that the trial court abused its discretion by denying Dyer's motion to sever the counts involving Ms. A and Ms. B from the counts involving Ms. W. The Court of Appeals determined that evidence that Dyer forcibly raped Ms. A and Ms. B was not admissible to prove that Ms. W also did not consent. However, the court held that evidence from the incidents involving Ms. W was admissible to help identify Dyer as the rapist of Ms. A and Ms. B. Therefore, the Court of Appeals affirmed Dyer's conviction of the two rape counts involving Ms. A and Ms. B but reversed and remanded the counts involving Ms. W for a new trial. The prosecuting attorney never retried Dyer on the counts involving Ms. W.
[2] The majority focuses exclusively on the language requiring consideration of the purposes, standards, and ranges of the SRA without even addressing the additional requirements to consider the recommendations of the sentencing court and the prosecuting attorney, which are equally present in RCW 9.95.009(2). The sentencing judge recommended that Dyer "should be held in custody until the parole board is absolutely sure the he will not reoffend or until the end of his natural life," and the prosecuting attorney recommended a minimum sentence of 50 years. Ex. 4, at 2. Clearly, these recommendations are at odds with the SRA ranges, and it is entirely within the ISRB's discretion to weigh these competing considerations in the attempt to make a decision that is reasonably consistent with all of them. The majority, in order to support its decision to remand to the ISRB, selectively picks and chooses which portions of the statute to give effect and which facts to consider.
[3] The majority also cites Greenholtz for the proposition that release determinations involve an "`assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done,'" implying that the ISRB erred by focusing on Dyer's underlying crimes. Majority at 322 (quoting Greenholtz, 442 U.S. at 10, 99 S.Ct. 2100) (internal quotation marks omitted). The majority takes this citation out of context. In Greenholtz, the United States Supreme Court reaffirmed the complete discretion of parole Board members to make release decisions. The language prior to that cited by the majority states that

[t]he parole-release decision ... is more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release.... The parole determination ... may be made
"for a variety of reasons and often involve[s] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate."
Greenholtz, 442 U.S. at 9-10, 99 S.Ct. 2100 (alterations in original) (quoting Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)).
[4] Although Dyer asserted a third ground on which the ISRB abused its discretion, by conditioning Dyer's release on a treatment program that was unavailable to him, the majority does not address this allegation.
[5] The full text of WAC 381-60-160 provides:

The board panel shall render a decision of either parolable or not parolable on each case heard under this chapter....
Examples of adequate reasons for a finding of nonparolability include, but are not limited to:
(1) Active refusal to participate in available program or resources designed to assist an offender to reduce the risk of reoffense (e.g., anger management, substance abuse treatment).
(2) Serious and repetitive disciplinary infractions during incarceration.
(3) Evidence of an inmate's continuing intent or propensity to engage in illegal activity (e.g., victim harassment, criminal conduct while incarcerated, continued use of illegal substances).
(4) Statements or declarations by the inmate that he or she intends to re-offend or does not intend to comply with conditions of parole.
(5) Evidence that an inmate presents a substantial danger to the community if released. In parolability hearings, actions may range from no change in the length of sentence to redetermination of the original sentence and imposition of an extension of the term not to exceed the maximum term.
[6] The majority asserts that "the psychological tests are administered by Washington State Department of Corrections psychologists and licensed mental health counselors." Majority at 325. However, Carter's psychological evaluation states that he has a master of science degree and is a "licensed mental health counselor," and the evaluation does not state that any psychologists helped administer the tests. Mot. for Discretionary Review, App. E at 5.
[7] The majority asserts that Carter evaluated Dyer's entire file. Majority at 321 n.3. Although Carter's written report lists other "Sources of Information" from Dyer's file, the extent to which Carter relied on anything other than his own interview, impressions, and observations is entirely unclear. For example, in discussing Dyer's "Sexual Behavior," Carter says only that:

No risk factors are explicitly apparent other than a hypothesized buildup of tension from the frustration of non-complementary relationships. People who are not as motivated or invested to perform life's tasks in a very exacting manner baffle this person. During this sentence, the inmate has displayed no apparent unacceptable sexual behavior.
Mot. for Discretionary Review, App. E at 3. Carter does not address Dyer's prior diagnoses of sexual sadism and extreme denial, nor does he discuss the impact of Dyer's failure to receive sex offender treatment on those diagnoses. By contrast, Carter devotes three long paragraphs to Dyer's family, military, and work history, including lengthy discussions of the accolades Dyer received from his service in Vietnam and his successes at work and in prison. Id.
[8] In an attempt to dismiss the relevance of the disturbing facts of Dyer's crimes, the majority again cites the ISRB's duty to attempt consistency with the SRA, and argues that the facts of Dyer's crimes are irrelevant under the SRA's sentencing scheme. Majority at 321 n.2. However, as the majority itself notes, Dyer was not sentenced under the SRA. See majority at 321 n.1. The ISRB makes all decisions related to Dyer's minimum sentence and release. Under RCW 9.95.170, not only are the facts of Dyer's crimes relevant to the ISRB's decision, the ISRB has a statutory duty to inform itself of those facts. It is entirely incorrect for the majority to suggest that the ISRB abused its discretion by considering those facts. See majority at 321 n.2, 324-25. On the contrary, the ISRB would have abused its discretion had it not considered them.
[9] As noted above, the majority does not address Dyer's claim that the ISRB refused to release him because he had not completed a treatment program that is unavailable to him. Regardless, this argument has little merit in light of this court's decision in Ecklund, 139 Wash.2d at 176, 985 P.2d 342 (holding that the ISRB may refuse to release a prisoner who has not received treatment because he denies guilt).