**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 13, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 13, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| In the Matter of the Personal Restraint of | NO. 98078-1 |
|---|---|
| DAVID DANIEL DODGE, | EN BANC |
| Petitioner. | Filed: January 13, 2022 |

GORDON McCLOUD, J.— David Daniel Dodge was convicted of first degree murder, rape, and burglary for crimes he committed in 1997, when he was 17 years old. He was sentenced to 50 years in prison. Twenty years later, the legislature passed a new law, RCW 9.94A.730. That new law gave people like Dodge—who received lengthy sentences for crimes committed as juveniles—a chance for earlier release, after serving at least 20 years of their sentence.

Two portions of that statute are key to our decision today. First, the statute requires the Indeterminate Sentence Review Board (ISRB) to begin with a presumption of release after 20 years and to apply that presumption of release by considering "affirmative and other conditions" that could make release work. RCW 9.94A.730(3) (ISRB "shall order the person released under such affirmative

No. 98078-1

and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released"). Second—and of equal importance—the statute directs the ISRB to "give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release." *Id.*

In this personal restraint petition (PRP), Dodge challenges the ISRB's application of this statute to his petition for early release after he had served more than 20 years of his 50-year sentence. PRP, *In re Pers. Restraint of Dodge*, No. 79540-6-I (Wash. Ct. App. Feb. 4, 2019). He argues that the ISRB erred in (1) failing to apply the presumption of release contained in RCW 9.94A.730, (2) failing to consider conditions of release that could reduce his risk to an acceptable level, as the statute mandates, and (3) relying primarily on static historical facts about his crime rather than on evidence of his rehabilitation.

This is our first opportunity to review the ISRB's application of RCW 9.94A.730 in an early release decision. We hold that the statute requires the ISRB to give public safety the "highest priority" in making early release decisions. RCW 9.94A.730(3). And the ISRB may certainly consider historical facts about a petitioner's crime to the extent they relate to that consideration. But the statute also

2

No. 98078-1

contains a mandatory (though rebuttable) presumption of early release. On this record, it appears that the ISRB placed singular weight on the duty to consider public safety, while failing to apply the presumption of release or meaningfully consider any conditions of release that might reduce risk to an appropriate level.

We therefore reverse the Court of Appeals and remand to the ISRB for a new early release hearing.

FACTS AND PROCEDURAL HISTORY

I.      DODGE IS CONVICTED AS A JUVENILE AND PETITIONS FOR EARLY RELEASE UNDER RCW 9.94A.730

In 1997, 17-year-old Dodge escaped from a juvenile group home, attended a party where he smoked marijuana and drank alcohol, and looked for a home to burglarize. Answer to Mot. for Discr. Review, App. 1, at 1 (Order Dismissing PRP). He found a nearby home with an unlocked door. *Id.* Inside, a 12-year-old girl was babysitting younger children. *Id.* When Dodge realized someone was home, he left the house and armed himself with a piece of wood. *Id.* at 2. He went back into the house, struck the girl in the head, and ran outside. *Id.* When he reentered the house and saw the girl was unconscious, he raped her. *Id.* She died of her injuries the next day. *Id.*

In February 1998, Dodge pleaded guilty to one count of first degree felony murder, one count of second degree rape, one count of residential burglary, and two counts of first degree burglary in Snohomish County Superior Court. Answer,

3

No. 98078-1

App. 4, at 1 (Judgment and Sentence). Dodge received exceptional sentences above the standard range on the murder, rape, and residential burglary counts and standard sentences on the first degree burglary counts, for an original total term of confinement of 746 months. *Id.* He was resentenced following appeal. *See State v. Dodge*, noted at 97 Wn. App. 1010, 1999 WL 675935, at *1 (remanding for resentencing). The parties agree that he received a sentence of 596 months at that time, but the record does not contain a new or amended judgment and sentence.

In 2018, after serving 20 years of his sentence, Dodge petitioned for early release pursuant to RCW 9.94A.730(1), which provides, with exceptions not relevant here, that "any person convicted of one or more crimes committed prior to the person's eighteenth birthday may petition the indeterminate sentence review board for early release after serving no less than twenty years of total confinement."

II.    DODGE UNDERGOES DOC PSYCHOLOGICAL EVALUATION

On May 9, 2018, Washington State Department of Corrections (DOC) psychological evaluator Dr. Deborah Wentworth conducted a psychological evaluation of Dodge, which is statutorily required prior to an early release hearing. RCW 9.94A.730(3); Answer, App. 5.

Dr. Wentworth described Dodge's family and childhood. His mother, a prison chaplain, met his biological father while he was incarcerated. Answer, App.

4

No. 98078-1

5, at 6. The two got married but divorced before Dodge was born. *Id.* Dodge's mother then remarried her ex-husband, who adopted Dodge as a child. *Id.* Dr. Wentworth described this situation as "an unusual and destabilizing influence in [Dodge's] life." *Id.* Dodge was teased often in school and was homeschooled for periods of his youth, and obtained a GED (general education degree) at age 16. *Id.* Dodge reported that at age 16, he was also thrown out of the back of a truck, hit his head, and had to be hospitalized for several days. *Id.* He developed a substance abuse problem around this same age. *Id.* at 7.

Dr. Wentworth reported that Dodge has incurred 11 total infractions in prison, 9 of which were serious. *Id.* But Dr. Wentworth also noted that "he has managed a significant improvement in his institutional behavior," as his last serious infraction occurred in 2007 and his last general infraction occurred in 2011. *Id.* She further explained that "his serious infractions ceased and his behavior improved significantly" by the age of 27, which was consistent with neurological studies on youth brain development. *Id.* Dodge reported that he changed his behavior because he "was embarrassed by [it], tired of the negative attention, and 'just grew up.'" *Id.*

Dodge has "completed all available programming to him," including programs in chemical dependency, relationship skills, community transitions, nonviolent communication, Sex Offender Treatment and Assessment Program

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(SOTAP), and SOTAP "Aftercare." *Id.* He has obtained a paralegal certificate and has also trained in welding, plumbing, steam fitting, and HVAC (heating, ventilating and air-conditioning). *Id.* at 6-7. Dodge is now married and has "a strong community support system," receiving frequent visits from his wife, sister, and mother. *Id.* at 11. He is a member of a local church, receives regular visits from his pastors, and plays backup guitar in the church band. *Id.* If released, he would have a stable address with his wife and a car provided by his parents. *Id.*

Dr. Wentworth administered three risk assessments. She characterized the first, the Hare Psychopathy Checklist Revised, as "currently the gold standard of predicting future risk by using levels of psychopathy as the major predictor." *Id.* at 13. She opined that it is "considered dynamic and reflects changes in risk levels prior to and subsequent to treatment." *Id.* Based on this test, Dodge poses a high risk of reoffense. *Id.*

On the second risk assessment, the Violence Risk Appraisal Guide-Revised (VRAG-R), which is an "actuarial scale designed to predict violent recidivism" that is "largely based upon Static information related to major life events . . . at, or prior to," the time of the crime, Dodge was also evaluated as a high risk. *Id.* Because this assessment considers only static factors from the time of the crime, it is unlikely to change over time. *Id.*

No. 98078-1

The third risk assessment, the Structured Assessment of Protective Factors (SAPROF), assesses "factors that may reduce or protect from future risk behaviors." *Id.* The SAPROF is scored dynamically and is "predominantly based on information from the past six months and the current plans regarding the near future." *Id.* Dodge scored "very well on the protective factors that may mitigate his overall level of risk based upon his most recent behavior choices," placing him in the "high" range of protective factors. *Id.* at 14. Other "significant mitigating factors" that may reduce Dodge's risk level include his "increasing age, decreased frequency of institutional misbehavior, and participation in criminogenic cognitive-behavioral programming." *Id.*

Dr. Wentworth also noted two risk assessment evaluations that had been previously administered by the SOTAP program in 2015 and 2018, which placed Dodge in the "moderate" or "moderately-high" risk range. *Id.* at 13.

Balancing Dodge's "high" and "moderately-high" assessed risk levels against his "high" level of protective factors, Dr. Wentworth concluded that Dodge "is at 'moderate' risk to reoffend." *Id.* at 15. "[D]ynamic factors such as 11 years of no serious infractions and the lack of current biological/neurological development risk factors that were present as an adolescent and young adult" supported this conclusion. *Id.* Dr. Wentworth concluded that Dodge's "behavior has improved over time" and that he "may be a reasonable candidate for reduction

7

in custody level at some time." *Id.* at 16. She advised that he proceed "with a gradual step down program so that his progress can be monitored and his chance of successful transition to the community may be increased." *Id.* She also noted that Dodge "may be a reasonable candidate for transitioning to a less restrictive setting," such as a "[c]amp setting," because Dodge's "rule breaking is considerably less than earlier in his incarceration and there is no recent behavioral indicator of escape risk." *Id.* at 16-17.

Dr. Wentworth made five specific recommendations to manage or reduce Dodge's risk of recidivism if he were released. *Id.* at 16. These recommendations included required participation in continued sex offender treatment and community transition programming, random drug and alcohol testing, required employment, and access to family and community supports. *Id.*

III.    THE ISRB DENIES DODGE'S PETITION

The ISRB held a hearing on September 4, 2018. Dodge appeared in person and was not represented by counsel. No transcript of the hearing appears in the record before us.

On September 19, 2018, the ISRB issued its written decision and reasons. Answer, App. 2. It found by a preponderance of evidence that Dodge "is more likely than not to commit a new crime if released with conditions that are designed to help better prepare him for a successful re-entry into society." *Id.* at 2. The ISRB

8

No. 98078-1

listed four reasons supporting its decision that Dodge was "not releasable": his status as a "Level III, high risk sex offender"; his high VRAG-R score; his description of the crime, which the ISRB found "provok[ed] doubt about his ability to understand his criminogenic treatment needs and risk factors"; and his "negative emotionality" and need to improve his ability to handle stressors. *Id.*

But the ISRB did not provide any further explanation about how the listed factors "Level III, high risk sex offender" or high VRAG-R score affected its decision. It did not address Dr. Wentworth's conclusions about recommended conditions or a step down in confinement. It did not address the doctor's balancing of the risk assessments with his infraction-free recent history. It did not mention that Dodge had scored "high" on the SAPROF protective factors assessment. It did not address any of the release recommendations made by Dr. Wentworth. Though it stated it made its decision "[b]ased on the requirements of RCW 9.94A.730," it did not mention the mandatory presumption of release. *Id.*

With regard to Dodge's description of his crime, the ISRB stated that Dodge "appears to have minimized his behaviors the night of the offense." *Id.* at 6. But as noted, the hearing transcript is not in the record before us. It is unclear from the written decision what specific questions the ISRB asked Dodge about the crime or whether it relied on another source that summarized the crime. *See id.* at 3-4.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 98078-1

The ISRB also determined that Dodge was not releasable because he "[n]eeds to continue to work on negative emotionality and handling stressors." *Id.* at 2. It appeared to base this reason on testimony from two SOTAP specialists. According to the decision, one specialist stated that Dodge "did not always accept feedback from his peers well and sometimes 'puffed up' and or took off his coat (a typical behavior for inmates wishing to be intimidating)." *Id.* at 5. The second specialist stated that Dodge's "negative emotionality" was "[o]ne of his highest risk[s]" and recommended individual and couples counseling in the community. *Id.*

The ISRB recommended that Dodge participate in further programming. It denied his petition for early release and noted that he could petition again in September 2023. *Id.* at 2.

IV.    THE COURT OF APPEALS DENIES DODGE'S PRP, AND DODGE MOVES FOR DISCRETIONARY REVIEW

In February 2019, Dodge filed a PRP challenging the ISRB's decision. He argued that the ISRB abused its discretion by finding him not releasable because it failed to apply the statutory presumption of release, failed to consider conditions of release that could reduce his risk to an acceptable level, and relied primarily on historical facts rather than on evidence of rehabilitation. PRP at 6-8.

The Court of Appeals dismissed the PRP, finding that "the ISRB's final decision demonstrates that it considered the relevant factors, including favorable

10

No. 98078-1

evidence of Dodge's lack of recent infractions and positive reports of his extensive participation in programming." Answer, App. 1, at 7.

In January 2020, Dodge filed a motion for discretionary review in this court. The commissioner directed the ISRB to file a response and permitted Dodge to file a reply, requesting that the parties discuss the applicability of our recent decision in *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020).[1] We granted review. Order, No. 98078-1 (2021).

STANDARD OF REVIEW

To succeed on a PRP challenge to an ISRB decision, a petitioner must show that he is under unlawful restraint. *In re Pers. Restraint of Dyer*, 164 Wn.2d 274, 285, 189 P.3d 759 (2008) (*Dyer* II) (citing RAP 16.4; *In re Pers. Restraint of Addleman*, 151 Wn.2d 769, 774, 92 P.3d 221 (2004)).[2] Dodge argues that the ISRB abused its discretion under the applicable statute by denying his early release

---

[1] In July 2020, we stayed consideration of Dodge's motion pending our decision in *In re Personal Restraint of Betancourt*, No. 97973-1, which raised a similar issue. But the *Betancourt* case was dismissed prior to oral argument because the ISRB found Betancourt releasable at an intervening hearing. The stay in Dodge's matter was then lifted.

[2] Because a petitioner challenging an ISRB decision "'generally has had no previous or alternative avenue for obtaining state judicial review,'" the usual threshold requirements of "actual and substantial prejudice" do not apply here. *In re Pers. Restraint of Mines*, 146 Wn.2d 279, 286, 45 P.3d 535 (2002) (quoting *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 149, 866 P.2d 8 (1994)).

No. 98078-1

petition and that this violated state law and constituted an unlawful restraint. PRP at 4; RAP 16.4(c)(2).

We have not yet expressly stated the standard by which we review the ISRB's early release decisions under RCW 9.94A.730. But the statute says that the ISRB's decision is "discretionary." RCW 9.94A.730(3). And we apply an abuse of discretion standard to ISRB decisions on early release in the parole context. *E.g.*, *Dyer* II, 164 Wn.2d at 286 (citing *Addleman*, 151 Wn.2d at 776). We therefore hold that the abuse of discretion standard applies to ISRB decisions under RCW 9.94A.730 as well. *Accord In re Pers. Restraint of Brashear*, 6 Wn. App. 2d 279, 285, 430 P.3d 710 (2018).

In general, we review release decisions "to ensure the ISRB exercises its discretion in accordance with the applicable statutes and rules." *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006) (*Dyer* I) (discussing review in the parole context). An abuse of discretion occurs when the ISRB bases its decision on "an erroneous view of the law,"[3] or when it "acts without consideration of and in disregard of the facts." *Id.* (citing *Addleman*, 151 Wn.2d at

---

[3] *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007) (citing *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006)); *State v. Orn*, 197 Wn.2d 343, 351, 482 P.3d 913 (2021).

No. 98078-1

776-77). "The ISRB cannot ignore the evidence presented at the hearing nor rely on mere conjecture in making its decisions." *Id.* at 369.

The petitioner bears the burden to prove the ISRB abused its discretion. *Dyer* II, 164 Wn.2d at 286 (citing *Addleman*, 151 Wn.2d at 776). But under RAP 16.9(a), the respondent has the burden of production in specific contexts. Of particular note given the paucity of the record in this case, that rule provides: "[i]f an allegation in the petition can be answered by reference to a record of another proceeding, *the response* should so indicate and *include a copy* of those parts of the record that are relevant." RAP 16.9(a) (emphasis added). Thus, respondent ISRB is the party that bears the burden of producing "a copy of those parts of the record that are relevant" to the petitioner's allegations.[4]

---

[4] Following the Court of Appeals decision, the briefing in this court, and oral argument, Dodge filed a document entitled "Motion for Leave To File Portions of the Record and To Authorize Preparation of the Transcript at Public Expense." He did not specify a court rule, such as the rule (RAP 9.10) permitting supplementation of the record under certain circumstances or the rule (RAP 9.11) concerning the taking of additional evidence on review, supporting that motion. The ISRB opposed. We deny Dodge's motion. However, under RAP 16.9(a), the ISRB, as respondent, had the duty to include the current judgment and sentence in its response to the PRP. RAP 16.9(a) ("The response must state the authority for the restraint of petitioner by respondent and, if the authority is in writing, include a conformed copy of the writing."). As discussed in text, it also should "include a copy of those parts of the record that are relevant" to "an allegation in the petition." *Id*. Thus, if the ISRB hearing transcript were "relevant" to Dodge's allegation that the ISRB failed to consider a mandatory statutory factor, then the ISRB "should" have included that "part[] of the record."

13

No. 98078-1

As to the meaning of RCW 9.94A.730 itself, we interpret the meaning of a statute de novo. *State v. Conover*, 183 Wn.2d 706, 711, 355 P.3d 1093 (2015) (citing *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 245, 955 P.2d 798 (1998)). The "primary objective" of statutory interpretation "is to determine and to apply the legislature's intent." *Id.* (citing *State v. Donaghe*, 172 Wn.2d 253, 261-62, 256 P.3d 1171 (2011)). "When interpreting a statute, we first consider the statute's plain language." *In re Pers. Restraint of Brooks*, 197 Wn.2d 94, 100, 480 P.3d 399 (2021) (citing *In re Adoption of T.A.W.*, 186 Wn.2d 828, 840, 383 P.3d 492 (2016)). "To determine a statute's plain meaning, we may look to the entirety of the statute in which the provision is found, related statutes, or other provisions within the same act." *Id.* (citing *T.A.W.*, 186 Wn.2d at 840). "We also frequently consider the court cases that led the legislature to enact the statute." *Id.*

ANALYSIS

I.    RCW 9.94A.730 WAS ENACTED AS "*MILLER*-FIX"[5] LEGISLATION, AND IT CONTAINS A PRESUMPTION OF RELEASE FOR QUALIFYING PERSONS SENTENCED TO LENGTHY TERMS AS JUVENILES

In 2012, the United States Supreme Court held in *Miller v. Alabama* that "children are constitutionally different from adults for purposes of sentencing," so "mandatory life without parole for those under the age of 18 at the time of their

---

[5] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); U.S. CONST. amend. VIII.

14

No. 98078-1

crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. at 471, 465.[6] In response, our legislature enacted several "*Miller*-fix" statutes.[7] Relevant here, RCW 9.94A.730 gave criminal defendants sentenced to lengthy terms as juveniles the right to petition the ISRB for early release after serving at least 20 years. Prior to the early release hearing, the petitioner must undergo a DOC examination "incorporating methodologies that are recognized by experts in the prediction of dangerousness, and including a prediction of the probability that the person will engage in future criminal behavior if released on conditions to be set by the board." RCW 9.94A.730(3).

The statute provides a clear presumption of release: "The board *shall order the person released under such affirmative and other conditions as the board determines appropriate*, *unless* the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released." *Id.* (emphasis added). The statute

---

[6] While subsequent United States Supreme Court cases, notably *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021), have arguably narrowed parts of *Miller*'s holding, these later developments do not change the plain text of the *Miller*-fix statute, nor can they change the legislature's intent at the time it enacted the statute. Moreover, state legislatures are free to enact laws that are more protective than required by the federal constitution, and state constitutions are likewise free to provide greater protection than the federal constitution requires. *E.g.*, *State v. Bassett*, 192 Wn.2d 67, 91, 428 P.3d 343 (2018). *Miller*'s analysis of why "children are different" for sentencing purposes is still an appropriate, relevant consideration in interpreting our state's *Miller*-fix statutes.

[7] *See* RCW 9.94A.730; RCW 10.95.030(3), .035.

15

No. 98078-1

also requires the ISRB to "give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release." *Id.*

The duty to prioritize public safety is not new—earlier statutes concerning parole hearings contained the same provision. *Compare* RCW 9.94A.730(3), *with* RCW 9.95.009(3).

But RCW 9.94A.730's presumption of release *is* new. And it has consequences: the statutory presumption of release in RCW 9.94A.730 "is a duty that limits the discretion of the ISRB." *Brooks*, 197 Wn.2d at 101.

The pre-SRA[8] parole scheme, in contrast, contains no such presumption. RCW 9.95.100 (ISRB "*shall not*" release person on parole "*unless* in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release" (emphasis added)). Instead, for prisoners sentenced under pre-SRA laws, parole is a "mere privilege," not a right, *January v. Porter*, 75 Wn.2d 768, 774, 453 P.2d 876 (1969), and the burden is on the petitioner to establish their rehabilitation and parole eligibility. *Dyer* I, 157 Wn.2d at 363 (for pre-SRA prisoners, the ISRB can make its decisions about release "'for a variety of reasons'" and such decisions "'often involve[] no more than informed predictions as to what would best serve [correctional purposes] or the safety and welfare of the inmate'" (second alteration

---

[8] Sentencing Reform Act of 1981, ch. 9.94A RCW.

16

No. 98078-1

in original) (internal quotation marks omitted) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 10, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979)).

In order to give effect to this presumption of release, the ISRB must give meaningful weight to evidence of the petitioner's rehabilitation, including "her awareness of her crimes, her changed behavior, [and] her assessed . . . risk to reoffend." *Brashear*, 6 Wn. App. 2d at 288. Further, the statute's plain terms require the ISRB to meaningfully consider appropriate release conditions that could lower the petitioner's risk of reoffense to an acceptable level. *Id.*; RCW 9.94A.730(3).

The legislature enacted RCW 9.94A.730 as part of the *Miller*-fix package, which also mandated resentencing hearings for juveniles sentenced to life without parole.[9] We may therefore look to those related statutes to understand the plain meaning of RCW 9.94A.730. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10, 43 P.3d 4 (2002).

We have made clear that a *Miller*-fix resentencing hearing is a "'forward-looking assessment . . . rather than a backward-focused review of the defendant's criminal history.'" *Delbosque*, 195 Wn.2d at 122 (quoting *United*

---

[9] LAWS OF 2014, ch. 130, §§ 9 (*codified as* RCW 10.95.030(3)), 10 (*codified as* RCW 9.94A.730), 11 (*codified as* RCW 10.95.035).

No. 98078-1

*States v. Briones*, 929 F.3d 1057, 1066 (9th Cir. 2019), *judgment vacated*, __ U.S. __, 141 S. Ct. 2589, 209 L. Ed. 2d 727 (2021)); *State v. Haag*, 198 Wn.2d 309, 320, 495 P.3d 241 (2021). Thus, a resentencing court must "'consider the measure of rehabilitation that has occurred since a youth was originally sentenced.'" *Haag*, 198 Wn.2d at 321 (quoting *Delbosque*, 195 Wn.2d at 121).

As we have explained, this is also true in the early release context. "[A]n early release hearing looks to the future and focuses on one's likelihood of reoffending." *Brooks*, 197 Wn.2d at 102. The plain language of RCW 9.94A.730 requires the ISRB to consider the risk of reoffense, sufficient conditions of release, and public safety. It presumes that a petitioner is releasable and requires the ISRB to determine, by a preponderance of evidence, that *no* conditions of release could sufficiently mitigate the petitioner's risk. RCW 9.94A.730(3).

We have made clear that RCW 9.94A.730's mandate that the ISRB consider public safety "does not override the presumption of release . . . and is, in fact, related to it." *Brooks*, 197 Wn.2d at 102 (comparing RCW 9.95.100 with RCW 9.94A.730(3)). In other words, consideration of public safety is *part* of the ISRB's consideration of the petitioner's likelihood to reoffend—not a separate, countervailing requirement. Otherwise, the presumption of release would have no meaning—because the only way to absolutely guarantee public safety would be to never release anyone. *See State v. K.L.B.*, 180 Wn.2d 735, 742, 328 P.3d 886

18

No. 98078-1

(2014) (courts "'must not interpret a statute in any way that renders any portion meaningless or superfluous'" (quoting *Jongeward v. BNSF Ry. Co.*, 174 Wn.2d 586, 601, 278 P. 3d 157 (2012))). To the extent that historical facts relating to a petitioner's crime or past behavior are relevant to a determination of public safety, the ISRB must certainly consider them. But the ISRB must also follow the statute's other mandatory directives—the ones about presuming release and meaningfully considering conditions to help accomplish release.

 With these considerations in mind, we turn to the ISRB's decision in this case.

II. THE ISRB ABUSED ITS DISCRETION IN APPLYING RCW 9.94A.730 BY FAILING TO APPLY THE STATUTORY PRESUMPTION OF RELEASE

Dodge argues that the ISRB's decision to deny early release was an abuse of discretion because the ISRB failed to apply the presumption of release, failed entirely to address any release conditions that might reduce his risk of reoffense, and relied primarily on historical facts rather than on evidence of rehabilitation. PRP at 6-8; Pet'r's Suppl. Br. at 2, 15. The ISRB contends that it exercised its discretion appropriately. Resp't's Suppl. Br. at 9.

In this case, the written decision itself provides sufficient evidence that the ISRB abused its discretion by failing to apply the statutory presumption of release. The written decision suggests that the ISRB treated Dodge's release decision the

No. 98078-1

same way that it would have treated a pre-SRA release decision, despite the

differences in language between the statutes governing each type of decision.

As noted, RCW 9.94A.730(3) explicitly requires the ISRB to release a

petitioner under "appropriate" "affirmative and other conditions" unless it finds by

a preponderance of evidence that "despite such conditions" the person is more

likely than not to reoffend. But the ISRB's written decision does not mention this

presumption of release. And the decision fails to meaningfully address *any*

recommended potential conditions of release.

For example, the DOC evaluator in this case suggested that Dodge may

currently be an appropriate candidate for a "[c]amp" setting and may be an

appropriate candidate for a gradual, step-down release plan "at some time."

Answer, App. 5, at 16-17. She noted the "significant mitigating factors" that

contributed to these recommendations, including Dodge's "increasing age,

decreased frequency of institutional misbehavior, and participation in criminogenic

cognitive-behavioral programming," *id.* at 14, the facts that Dodge's "rule breaking

is considerably less than earlier in his incarceration and there is no recent

behavioral indicator of escape risk." *Id.* at 17. She provided five detailed

recommendations as to release conditions that could mitigate Dodge's risk. *Id.* at

16. And one SOTAP specialist who testified at the hearing apparently

20

recommended individual and couples therapy in the community to address

Dodge's "negative emotionality." PRP, App. 2, at 5.

But the ISRB did not discuss a single one of these recommendations or

potential conditions of release. It stated simply that it found Dodge more likely

than not to reoffend "if released with conditions that are designed to help better

prepare him for a successful re-entry into society." *Id.*, App. 2, at 2.

Compliance with the statutory presumption of release requires more than

that conclusory statement. To be sure, the statute does not require the ISRB to

"specifically list *any and all* potential conditions it might set, in order to then

conclude that despite any or all of those conditions, Dodge was likely to reoffend."

Resp't's Suppl. Br. at 16 (emphasis added). And the ISRB is certainly not required

to agree with or to adopt the recommendations and conclusions made by the

psychological evaluator. Answer at 6. But the ISRB was not free to disregard the

evaluator's specific, detailed release recommendations. It is not apparent from this

record that the ISRB meaningfully considered the presumption of release or

whether any conditions of release would sufficiently mitigate Dodge's risk level.

This amounts to a failure to apply the statutory presumption of release. This

misapplication of the statute constitutes an abuse of discretion.

We disagree with Dodge to the extent he argues that it was improper for

ISRB to consider historical or "backward-looking" facts about a petitioner's crimes

21

No. 98078-1

at all. Pet'r's Suppl. Br. at 13-15. Such information might certainly be relevant to the ISRB's statutorily required consideration of public safety. *See* RCW 9.94A.730(3). The statute, however, also makes clear that "an early release hearing looks to the future and focuses on one's likelihood of reoffending." *Brooks*, 197 Wn.2d at 102. Where, as here, the decision focuses primarily on historical facts relevant to public safety yet fails to discuss any potential conditions of release or mention significant findings of rehabilitation, such as Dodge's high score on the protective factors assessment, we cannot say that the ISRB applied the statutory presumption of release.

We certainly agree with the ISRB that "[t]here is no mathematical formula to make [a release] decision, and 'there is no set of facts, which, if shown, mandate a decision favorable to the individual.'" Resp't's Suppl. Br. at 8 (quoting *Inmates*, 442 U.S. at 10). But, as discussed above, RCW 9.94A.730 placed a limit on the ISRB's discretion. The legislature now requires the ISRB to begin with a presumption of release, and it further requires the ISRB to seriously consider evidence of rehabilitation and risk-mitigating factors as they relate to its decision regarding public safety.

The record before us does not indicate that the ISRB followed these statutory directives. We therefore hold that the ISRB abused its discretion in applying RCW 9.94A.730.

22

No. 98078-1

CONCLUSION

RCW 9.94A.730 contains a presumption of release and places limits on the ISRB's discretion in considering early release petitions. The record in this case is devoid of evidence that the ISRB meaningfully applied the statutory presumption of release or meaningfully considered the potential release conditions recommended by the psychological evaluator or the SOTAP specialist. The ISRB may not "disregard the evidence presented at the hearing" or fail to make decisions "in accordance with the applicable statutes and rules." *Dyer* I, 157 Wn.2d at 359, 363; *see also Dyer* II, 164 Wn.2d 286; *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007) (citing *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006)). Because it did so here, the ISRB abused its discretion.

The remedy is remand for a new hearing. *See Dyer* I, 157 Wn.2d at 369. We therefore reverse the Court of Appeals and remand to the ISRB for a new RCW 9.94A.730 hearing.

23

No. 98078-1

Gordon McCloud, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.