IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 82123-7-I |
| KENNETH A. BIANCHI | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

ANDRUS, C.J. — In 1979, after Kenneth Bianchi pleaded guilty to murdering two women, he was sentenced to two consecutive life sentences. He filed this personal restraint petition when, in 2018 and again in 2020, the Indeterminate Sentence Review Board (ISRB) denied his request to be paroled from the first life sentence so he can begin serving the second one. Bianchi contends, as he has alleged in multiple petitions, that he is actually innocent, that he did not commit the two murders here or another five murders to which he pleaded guilty in California, that he did not rape any of his seven murder victims, that his confession in Washington was unreliable because it was the product of hypnosis, and that the ISRB violated his due process rights by making a parole decision based on false or inaccurate information regarding his crimes and criminal history. We disagree and deny this petition.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In January 1979, the State of Washington charged Bianchi with killing two young women by strangulation in Bellingham. During the following police investigation, law enforcement linked Bianchi to a string of unsolved murders in California. The State of California subsequently charged Bianchi with multiple crimes arising out of string of kidnappings, rapes, and murders in Los Angeles that Bianchi allegedly committed with his cousin, Angelo Buono.

Bianchi initially pleaded not guilty to the Washington murders. In March 1979, when the State announced its intention to seek the death penalty, Bianchi switched his plea to not guilty by reason of insanity. In order to assess Bianchi's fitness to stand trial and his mental condition as it pertained to his defense, Bianchi was examined by six different psychologists, including Dr. Saul Faerstein.

Two defense experts used hypnosis while examining Bianchi and believed he suffered from a multiple personality disorder. Two experts retained by the State concluded Bianchi was actually faking and was not in fact ever under a state of hypnosis. They also concluded Bianchi fabricated the entire multiple personality disorder scheme. During these evaluations, Bianchi confessed to luring the two women to a home he was then monitoring for a security company with whom he was employed, tying the women up, sexually assaulting them, and then strangling them.

After all six experts found him competent to stand trial, Bianchi stipulated to his competency and negotiated a plea agreement. On October 19, 1979, Bianchi pleaded guilty to two counts of first-degree murder in Washington as part of the

plea agreement between Bianchi, the State of Washington, and the State of California. The agreement provided that the State would withdraw its request for the death penalty and recommend that Bianchi receive two life sentences, to be served consecutively. Bianchi further agreed to plead guilty to various crimes in California, including five counts of first-degree murder and one count of sodomy. Bianchi also agreed to testify truthfully in the trial of Buono, who was charged with ten related murders in California. In exchange for testifying in Buono's California trial, California agreed to permit Bianchi to serve his sentences in that state first, so he could access treatment options not otherwise available in the Washington corrections system.

Officer Duane Schenck, one of the detectives investigating the Bellingham murders, testified at the hearing at which Bianchi pleaded guilty. He explained how the police had undertaken the investigation that led them to Bianchi and recounted the details Bianchi provided to Dr. Faerstein, including his confessions regarding his sexual assault and murder of both victims.

Schenck also described the forensic evidence that the State had obtained corroborating Bianchi's confession. First, an autopsy of both victims indicated they were killed by strangulation with a ligature. Second, the FBI found fibers of the women's clothing in the house Bianchi was monitoring for his employer while its owners were away on vacation. Third, the FBI found Bianchi's pubic hair on the outer clothing of one of the victims and semen stains on the clothing of the victims. Finally, law enforcement found the victims' bodies in one of their vehicles, as he described to the evaluators.

- 3 -

Bianchi neither objected to nor took issue with this evidence when the State presented it.

The trial court sentenced Bianchi to two consecutive terms of life imprisonment for his Washington crimes. Bianchi was then transported to California to enter his guilty pleas. He pleaded guilty to five counts of murder, one count of sodomy, and one count of felony conspiracy to commit murder and/or kidnapping or rape. According to the Department of Corrections (DOC) criminal history summary,

> In murdering all of these girls, Bianchi and his cousin, Angelo Buono, used a similar procedure in each case. The girls would often be picked up by Bianchi and Buono as a false vice arrest. The girls would then be transported to Angelo Buono's business, and there they would be disrobed, raped by both Bianchi and Buono, and then strangled to death. All of their clothing would be thrown in the garbage container, and the bodies would then be transported from Buono's business to the hillside area where they were subsequently found. Based on Bianchi's plea of guilty to the previous five murder charges, he was not charged with [another five murders attributed to him and Buono].

Bianchi was sentenced to concurrent life sentences for the California murders and has a felony detainer to the State of California, in the event he is ever released by the State of Washington.

California authorities subsequently concluded that Bianchi failed to cooperate fully in the California proceedings and it returned him to Washington to serve his sentences here first.[1]

---

[1] For a first-hand account of the California trial of Angelo Buono, see Justice Roger W. Boren's article, "The Hillside Strangler Trial," 33 Loyola of Los Angeles Law Review 707 (2000), in which Justice Boren describes his prosecution of Buono and Bianchi's testimony during that trial.

In 1990, pursuant to an amendment to the indeterminate sentencing statute, the ISRB fixed the minimum term of Bianchi's confinement on his first murder conviction at 702 months and the minimum term on his second conviction at 722 months, with the two counts running consecutively for a total of 1,424 months. Because these terms exceeded what would have been the standard range terms had Bianchi been sentenced under the Sentence Reform Act, the ISRB cited a number of aggravating factors justifying the length of the sentence, including that Bianchi's crimes involved multiple victims, exhibited a high degree of sophistication, and manifested deliberate cruelty to his victims. The ISRB further concluded that Bianchi represented "a very high risk for future dangerousness."

Between 1990 and 2018, Bianchi filed numerous personal restraint petitions with this court and the Supreme Court, challenging his arrest, his detention, the use of hypnosis by psychologists before he pleaded guilty, the use of a confession he claimed was obtained through hypnosis, the effectiveness of his trial counsel, the constitutionality of his guilty plea, a claim of actual innocence, a challenge to the ISRB's minimum sentences, and an alleged breach of the plea agreement by the Whatcom County prosecuting attorney and the State of California.[2] Bianchi has repeated many of these same claims in federal filings, where he specifically alleged his confession and guilty pleas were coerced by "hypnotic manipulation." No court has deemed any of his factual claims credible.

---

[2] *See* orders dismissing personal restraint petitions in Court of Appeals Nos. 20920-5-I, 21853-1-I, 26586-5-I, 36322-1-I, 36749-8-I, 51299-4-I, 51810-1-I, 53325-8-I, 59020-1-I, 63000-8-I, 66980-0-I, and Supreme Court Nos. 70381-7, 73394-5-I, 76440-9, 77865-5, 79451-1.

After Bianchi served approximately 469 months of his first murder sentence, the ISRB scheduled a parolability hearing for November 2018. In preparation for this hearing, the DOC End of Sentence Review Committee (ESRC) performed a file review for the ISRB. The ESRC based its report in large part on Bianchi's confession and the factual details of his five murder convictions in California. It also set out the details of five additional murders that California law enforcement believed to be attributable to Bianchi. He was neither charged with nor convicted of these crimes. All of the ten California murders, including the crimes to which Bianchi pleaded guilty, involved sexual assaults of the victims.

Because the DOC deemed Bianchi's crimes to involve sexual motivation, the ESRC conducted a "Static-99R" actuarial risk assessment and concluded that, after considering aggravating factors, Bianchi is a sex offender with a risk level of III, indicating a high risk of reoffending if released to the community.

The ISRB referred Bianchi for a psychological evaluation with Dr. Lisa Robtoy. Bianchi attended the appointment but refused to participate in the evaluation "due to pending court issues" and told Dr. Robtoy that his file had been filled with "garbage" from his previous evaluations. Bianchi explained to the ISRB that "regardless of what he says [, Dr. Robtoy] would be using information from his file that is untrue, unproven and incorrect" and his participation would "giv[e] legitimacy" to her findings.

Dr. Robtoy reviewed Bianchi's file and evaluated his risk of reoffending.[3] Dr. Robtoy's psychological evaluation recited the facts of his murders, as laid out in his 1979 sentencing hearing, including the fact that Bianchi had sexually assaulted his victims. She concluded that Bianchi is a high moderate risk for recidivism. Dr. Robtoy opined, however, that the standard assessments she used may not fully capture Bianchi's level of risk because they were "normed on a more typical criminal profile," and not on the "relatively rare" serial murderer like Bianchi. She noted

> [h]e has not participated in any victim empathy classes, or programs to address violent thoughts and/or sexual sadism, and he continues to demonstrate a lack of remorse for his behavior as there are inconsistencies in his record about his willingness to acknowledge the crimes. When he has admitted involvement, his confessions seem to be driven by what will benefit Mr. Bianchi in the moment, and not out of remorse or guilt.

Dr. Robtoy further found that there was "no evidence to suggest that Mr. Bianchi's underlying personality structure has changed."

The ISRB held a hearing to determine Bianchi's parolability on his first murder conviction in November 2018. Bianchi refused legal representation and did not attend this hearing. The ISRB found that Bianchi was not parolable because

---

[3] Dr. Robtoy used the Hare Psychopathy List (PCL-R), which predicts future risk by using levels of psychopathy as the major predictor. With this, she concluded that Bianchi was at high moderate risk for psychopathy and at a high moderate risk for reoffending. Notably, Bianchi received the highest score possible on the measure of psychopathy personality traits. Next, she applied the VRAG-R, an actuarial scale designed to predict violent recidivism, which indicated that Bianchi has a 34 percent likelihood of reoffending within five years of release and a 60 percent likelihood of reoffending within 12 years. Finally, she applied the Historical-Clinical-Risk Management-20 (HCR-20), which indicated that Bianchi was at a high moderate risk of recidivism.

–  He chose not to attend his hearing and as such could not be assessed by the Board.
–  [He was a]ssessed by the ESRC as a level Three for community notification and [the ESRC] ordered a Forensic Psychological Evaluation in the event he is found releasable.
–  He refused to participate in a Psychological Evaluation on March 6, 2018.
–  [He] has a large number of victims and with an extensive offending history.
–  His most recent Psychological Evaluation assesses him as a moderate risk for a future sexual re-offense.  He is assessed as meeting the criteria for Psychopathy on the PCL-R.

The ISRB added 120 months to his minimum term.  The ISRB indicated that it would hold another parolability hearing before the expiration of the additional 120-month minimum term if Bianchi agreed to participate.

The ISRB held a new hearing on January 22, 2020.[4]  This time Bianchi, represented by counsel, appeared and testified.  Bianchi vehemently denied having committed any of the crimes of which he was convicted and claimed his confession was false because it had been planted in his brain by the experts through hypnosis.  He also contended that two Bellingham investigators who testified in Buono's trial confirmed he had probably lied about sexually assaulting his Washington victims.

On February 10, 2020, the ISRB issued a decision denying Bianchi's request for parole.  The ISRB first detailed the basis for Bianchi's convictions and incarceration.  In describing Bianchi's Washington crimes, the ISRB characterized both victims as having been "sexually assaulted and murdered" by Bianchi.  The ISRB also discussed Bianchi's prior criminal and risk-related conduct.  It gave a

---

[4] The ISRB did not request, and Bianchi did not undergo, a new psychological evaluation because Bianchi stated that he would not participate.

detailed description of the five counts of murder to which Bianchi pleaded guilty in California.  And it included detailed descriptions of the five murder allegations against Bianchi of which he was neither charged nor convicted.  The ISRB noted that it "routinely provides non-criminal history information in its decision when appropriate."

The ISRB also considered a number of positive factors demonstrating Bianchi's progression toward rehabilitation.  It highlighted that Bianchi's last serious infraction was in 1996 and that he reported that he had received several degrees, including an Associate of Arts, a Bachelor of Arts, and a Juris Doctor, and had completed an Evangelical Theological Seminary program.  But, it noted, beyond this education and vocational training, Bianchi had not completed any programming.

The ISRB again concluded that Bianchi was not parolable and gave the following reasons:

- End of Sentence Review Committee (ESRC) Level III Notification aggravated from Level I due to documented information that increases risk for sexual re-offense and relationship with victims were established for primary purpose of victimization.
- ESRC will order a Forensic Psychological Evaluation for possible civil commitment as a sexually violent predator in the event he is found releasable.
- He has not completed risk related programming that may mitigate his risk.
- He refused to participate in a Psychological Evaluation on March 6, 2018.
- Has a large number of victims and with an extensive offending history.
- Takes no responsibility for any of his convictions and denies his crimes although he plead guilty to them.  He does not appear to have any insight into his criminal behaviors and risk.

- Dr. Robtoy Psychological Evaluation – "While the risk assessment tools used in the present evaluation measured his overall risk to be high moderate, Mr. Bianchi's personality structure is psychopathic in nature, which in this examiner's clinical opinion, makes him a high risk to re-offend if he were released from the controlled and structured environment of prison"
  - She does not support a release
  - He remains a high risk for community safety issues
  - He has not participated in any programming that would change the way he thinks, feels or behaves
  - Professional opinion, based upon my education, training, and experience that Mr. Bianchi is not a good candidate for release to the community at this time, as he remains a high risk for community safety issues.

The ISRB further highlighted Dr. Robtoy's conclusion that Bianchi met every criteria to be considered a psychopathic personality, which "alone should be seen as a major risk factor." Although the ISRB deemed Bianchi to be not parolable, it added no additional time to his minimum term for the first conviction.

Bianchi filed this personal restraint petition to challenge the ISRB's denial of parole on the first of his two murder convictions.

<u>ANALYSIS</u>

To succeed on a challenge of an ISRB decision, a petitioner must show that he is under unlawful restraint. *In re Pers. Restraint of Dyer,* 164 Wn.2d 274, 285, 189 P.3d 759 (2008) (*Dyer II*) (citing RAP 16.4(b), (c)); *see also In re Pers. Restraint of Addleman,* 151 Wn.2d 769, 774, 92 P.3d 221 (2004). Bianchi claims he is unlawfully restrained because the ISRB abused its discretion by finding him not parolable. The ISRB abuses its discretion when it "fails to follow its own procedural rules for parolability hearings or acts without consideration of and in disregard of the facts." *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006) (*Dyer I*). Reliance on speculation or conjecture or "disregard[] [of]

- 10 -

the evidence" also may constitute an abuse of discretion. *Id.* at 369. Bianchi bears the burden of proving that the ISRB abused its discretion. *Dyer II*, 164 Wn.2d at 286.

Bianchi relies on *Dyer I* to argue that the ISRB based its 2018 and 2020 decisions on what he deems to be an unreliable and factually inaccurate confession to sexual assault and murder. He also argues that we should permit him to challenge the ISRB's 1990 decision establishing the minimum terms for his two life sentences, despite the passage of time.

<u>Timeliness of Bianchi's Petition</u>

The ISRB argues that any challenges to its actions prior to the 2020 hearing are time-barred and we should decline to consider them. We agree that Bianchi is precluded by RCW 4.16.130 from challenging ISRB decisions prior to November 2018. But Bianchi's petition challenging both the 2018 and 2020 decisions on parolability, filed in November 2020, is timely.

A one-year statute of limitations generally governs a personal restraint petition. RCW 10.73.090(1) states:

> No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction.

But this limitation period applies only to a personal restraint petition that challenges the offender's judgment and sentence. *In re Pers. Restraint of Heck*, 14 Wn. App. 2d 335, 340-41, 470 P.3d 539 (2020), *review denied*, 196 Wn.2d 1047, 481 P.3d 1096 (2021). A decision by the ISRB denying conditional release is not a "judgment and sentence in a criminal case." *In re Pers. Restraint of Betts*, 21 Wn.

- 11 -

App. 2d 173, 176, 505 P.3d 148 (2022). Instead, denial of conditional release is "'an administrative act which follows sentencing.'" *Id.* (quoting *State v. King,* 130 Wn.2d 517, 526-27, 925 P.2d 606 (1996)). Because of this, a collateral attack on an ISRB decision denying release is not an attack on the judgment and sentence in a criminal case and, therefore, is not subject to the statute of limitations found in RCW 10.73.090. *Id.* at 177. Instead, the two-year statute of limitations under RCW 4.16.130 applies to a petitioner's collateral attack of the ISRB decision denying his conditional release.[5] *Id.*

The ISRB found Bianchi not parolable on December 3, 2018. It amended that decision on January 4, 2019. Because Bianchi did not participate in 2018, the ISRB agreed to rehear the matter in 2020. The ISRB again found Bianchi not parolable on February 10, 2020. Bianchi filed his petition on November 23, 2020, within two years of both ISRB decisions. Under RCW 4.16.130, Bianchi's challenges to the ISRB's 2018 and 2020 decisions are both timely.

To the extent Bianchi challenges any ISRB decisions prior to November 2018, including its decision setting the minimum terms of his sentences, any challenge to such decisions is time-barred under RCW 4.16.130.

---

[5] Because Bianchi also alleges that the ISRB breached the 1979 plea agreement, which the ISRB contends constitutes a collateral attack to his judgment and sentence, the ISRB argues we should dismiss the entire petition as a mixed petition. Normally, the entirety of a mixed petition must be dismissed as time-barred. *In re Pers. Restraint of Hankerson*, 149 Wn.2d 695, 700, 72 P.3d 703 (2003). But this rule was created by the Supreme Court based on the unique wording of RCW 10.73.100. *Id.* at 699. RCW 10.73.100, by its terms, applies only to petitions governed by RCW 10.73.090. RCW 10.73.090 does not apply to petitions challenging conditions of release. Therefore, the mixed petition rule does not apply to a petition challenging a parolability decision.

Due Process

Bianchi argues that the ISRB violated his right to due process when it relied on information about the Washington murders which it had reason to know was inaccurate. We disagree.

The due process clause of the Fourteenth Amendment states that the State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; WASH CONST. art. I, § 3. This amendment requires that state action be implemented in a fundamentally fair manner. *State v. Beaver*, 184 Wn.2d 321, 332, 358 P.3d 385 (2015).

Bianchi's sentence is governed by the indeterminate sentencing provisions of chapter 9.95 RCW under which the trial court sets the defendant's maximum sentence and the ISRB establishes the defendant's minimum term and eligibility for parole. *In re Pers. Restraint of Lain*, 179 Wn.2d 1, 11, 315 P.3d 455 (2013). "[T]he minimum term carries with it no guaranty of release; it only establishes a date when the inmate becomes eligible to be *considered* for parole." *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 143, 866 P.2d 8 (1994). The ISRB cannot grant parole until it determines the inmate has been rehabilitated and is a fit subject for release. RCW 9.95.100.

Our Supreme Court has recognized that certain due process rights apply when the ISRB sets and redetermines minimum terms. *In re Pers. Restraint of Whitesel*, 111 Wn.2d 621, 631, 763 P.2d 199 (1988). This includes the right to be advised of adverse information in the inmate's file and the opportunity to rebut or to explain that adverse information. *In re Pers. Restraint of Sinka*, 92 Wn.2d 555,

568-69, 599 P.2d 1275 (1979). These due process rights help ensure that ISRB action is not based on misleading or erroneous file information. *Id*. at 566. The ISRB must also follow its own procedural rules for a parolability hearing. *Dyer I*, 157 Wn.2d at 363. The ISRB is required to make its decision based on the evidence presented at the parolability hearing. *Id.* at 365. It cannot ignore the evidence presented at the hearing or rely on mere conjecture in making its decisions. *Id.* at 369.

In denying Bianchi parole, the ISRB relied on the ESRC's level III risk assessment[6] and Dr. Robtoy's psychological evaluation. Both of these assessments were based, in part, on Bianchi's confession that he had sexually assaulted his Washington victims. Bianchi argues the ISRB violated due process protections and abused its discretion when it relied on his statement that he sexually assaulted his victims because he presented evidence that his confession was false or, at a minimum, unreliable.

Bianchi's argument is based on the 1982 testimony of two Bellingham police investigators at Buono's California murder trial in which they questioned the reliability of some of the details of Bianchi's confession. The officers did not believe Bianchi's statement that he had sexually assaulted both of his Washington victims before their deaths and stated that the forensic evidence supported a conclusion that he engaged in some sexual contact with one victim but did so after killing her. Specifically, they highlighted certain factors—including that the victims were found

---

[6] "The [ESRC] shall classify as risk level III those offenders whose risk assessments indicate they are at a high risk to sexually reoffend within the community at large." RCW 72.09.345(6).

fully clothed—that they believed did not corroborate Bianchi's confession. Despite the discrepancies they found, both officers opined that Bianchi had, in fact, killed both girls. Bianchi highlighted this testimony at the 2020 hearing and argued that he was not guilty of *any* murders, even those to which he pleaded guilty.

Bianchi contends that the 1982 testimony "definitively disproved" the details of his confession and argues that the ISRB rejected this evidence without meaningful inquiry.[7] He urges us to adopt the reasoning of the Ohio Supreme Court in *State ex rel. Keith v. Ohio Adult Parole Auth*., 141 Ohio St. 3d 375, 24 N.E.3d 1132 (2014). In that case, the Ohio Adult Parole Authority (OAPA) denied Keith's request for parole and explained that its decision was based in part on information in his file indicating that he had been paroled eight times. *Id.* at 376. That statement was factually incorrect; Keith had been paroled only six times. *Id.* at 376-77. Keith requested a new hearing and decision based on the correct number of times he had been paroled but OAPA denied this request. *Id.* at 376.

---

[7] The ISRB argues that the hearing officer at the 2020 hearing was entitled to disregard this evidence because Bianchi presented only piecemeal excerpts of the investigators' trial testimony and the transcript did not comply with ER 106. But the presiding officer was not bound by the rules of evidence at the hearing. WAC 381-60-150 states that "[a]ll relevant evidence shall be admissible" and, in deciding the admissibility of any piece of evidence, the ISRB "shall give consideration to, but shall not be bound to follow, the rules of evidence." Here, the presiding officer never ruled that the transcripts were inadmissible. Nothing in the record suggests the ISRB disregarded it on that basis. Moreover, ER 106, which states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part . . . which ought in fairness to be considered contemporaneously" would only have been grounds for the ISRB to request that Bianchi supplement the record by providing the transcript in its entirety. Nonetheless, even if the 1982 transcript excerpts were admissible, the ISRB was still entitled to afford this evidence little weight, given that the piecemeal nature of the transcripts and contradictory evidence in the record created a risk that the testimony was taken out of context.

The Ohio Supreme Court, in granting a writ of mandamus, noted that, while there is no constitutional right to parole, the state created a minimal due process expectation by setting up a parole system and defining at least some of the factors to be considered in a parole decision. *Id.* at 379-80. The court held that inmates eligible for release must receive "meaningful consideration" for release, and that "where there are credible allegations, supported by evidence, that the materials relied on at a parole hearing were substantively inaccurate, the OAPA has an obligation to investigate and correct any significant errors in the record of the prisoner." *Id.* at 380.

The *Keith* case is consistent with our expectations of due process in Washington. In *Dyer I*, the ISRB denied parole to an inmate serving time for rape, despite a recent psychological evaluation deeming him to be of low risk of reoffending. The Washington Supreme Court deemed the ISRB's decision to be an abuse of discretion because the board had rejected the recent evaluation based on "speculation and conjecture" and suggested that the inmate had simply learned how to take psychological tests. 157 Wn.2d at 365. The court concluded that "[w]hen the ISRB disregards current psychological reports and evaluations and gives significant weight only to previous evaluations that support a finding that an inmate is not parolable without making findings to support that approach, the ISRB fails to follow the procedures outlined by the WAC regulations." *Id.* at 366.

This case is, however, distinguishable on its facts from both *Keith* and *Dyer I*. In *Keith*, there was information in his file that was undisputedly and objectively false. Here, by contrast, Bianchi presented evidence that two investigators did not

personally believe every detail of the crimes to which Bianchi confessed. But, contrary to his assertions, the officers' testimony does not "definitively disprove" Bianchi's confession. The crux of the testimony that Bianchi provided was that investigators lacked forensic evidence to corroborate some of Bianchi's statements, not that they could prove the statements to be unequivocally false. The officers testified there was no evidence the victims had been tied up, as Bianchi reported; there was "no outstanding indication" that one of the victim's clothes had ever been removed; and there was "no way to physically check" if Bianchi had used a gun in the manner he reported.

But there was forensic evidence corroborating that at least one of Bianchi's victims was sexually assaulted. Both officers confirmed this fact. They testified that one of the victim's underwear was rolled down and they found Bianchi's pubic hairs on one of the victims and in the house where he killed them. Additionally, semen stains were found on the clothing of the victims. The investigators' testimony does not, as Bianchi contends, disprove his sexual motivation in committing the murders.

Moreover, Bianchi's insistence that he was never convicted of any sexually motivated crimes in California lacks credibility. The ESRC Report indicates that every one of the five California murders to which Bianchi pleaded guilty involved the abduction and sexual assault of his victims. Even if Bianchi only engaged in sexual contact with one of the Washington victims after he killed her, as the investigators believed in 1982, he confessed to significant sexual misconduct in California, evidence supporting the ESRC sex offender risk assessment.

- 17 -

Under DOC Policy 350.500, the ESRC considers murder in the first degree to be a sexually violent offense if committed with sexual motivation. *See also* RCW 71.09.020(18) (defining "sexually violent offense" as including "an act of murder in the first or second degree . . . which act, either at the time of sentencing for the offense or subsequently during civil commitment proceedings pursuant to this chapter, has been determined beyond a reasonable doubt to have been sexually motivated.") Given that Bianchi pleaded guilty to five murders with sexual motivation, and there is evidence of some sexual motivation in at least one of the Washington murders, we cannot conclude the ISRB abused its discretion in relying on the ESRC's risk assessment in denying parole.

And unlike *Dyer I,* the record also demonstrates that the ISRB considered Bianchi's contention that he did not sexually assault his victims and weighed the totality of the evidence before it before concluding that Bianchi's crimes *were* sexually motivated. The ISRB acknowledged that:

> Mr. Bianchi does not agree with the facts of his crimes as outlined in the ESRC report. He gave a long explanation as to why he plead[ed] guilty and why he is not guilty of any of the crimes he is convicted of, stating that 'it was mandatory' to sign the plea agreement and he was simply complying with terms within the plea agreement. Mr. Bianchi said that when he was under hypnosis the psychologist used leading techniques and planted the idea of him having Multiple Personality Disorder. Which he says was not true. He says the incriminating admissions were made while he was under hypnosis. When asked by the Board if he was under hypnosis when he signed the plea agreement he said no. It is apparent that Mr. Bianchi has spent most of his time in prison working and analyzing/challenging his convictions.

The ISRB did not disregard the information Bianchi put before them; it simply did not find it credible or otherwise sufficient to deem him parolable.

- 18 -

Furthermore, the record demonstrates that the ISRB parolability decision was based on a number of factors unrelated to Bianchi's history of sexually assaulting his victims. The ISRB based its decision on the fact that Bianchi had no insight into his criminal behaviors, had completed no risk-related programming, had refused to participate in Dr. Robtoy's psychological evaluation, and had a large number of victims and an extensive criminal history.[8] This decision is supported by the non-exhaustive list of adequate reasons for non-parolability found in WAC 381-60-160; *Dyer I*, 157 Wn.2d at 363-64.

Finally, under RCW 9.95.100, the ISRB cannot grant parole until it determines the inmate has been rehabilitated and "[i]t is almost axiomatic that the first step toward rehabilitation of an offender is the offender's recognition that he was at fault." *In re Pers. Restraint of Ecklund*, 139 Wn.2d 166, 176, 985 P.2d 342 (1999) (quoting *Gollaher v. United States*, 419 F.2d 520, 530 (9th Cir. 1969)). As the ISRB noted, Bianchi refuses to take responsibility for his crimes and claims, after 40 years, to be innocent despite having pleaded guilty in two states to seven murders. The ISRB considered all the evidence before it and its decision to deny Bianchi parole is supported by that evidence.

In supplemental briefing, Bianchi contends the ISRB violated his due process rights by considering a confession obtained through hypnosis. But the ISRB was within its discretion to reject the contention that Bianchi was, in fact, under hypnosis when he confessed to having sexually assaulted and murdered his

---

[8] It is simply not credible to argue that murdering seven women does not involve "a large number of victims" or does not constitute "an extensive offending history."

Washington victims. The record reveals that at least two experts who examined Bianchi in 1979 concluded he was faking when he claimed to be in a state of hypnosis. Bianchi has failed to demonstrate that he was in fact in a state of hypnosis when he confessed his crimes. We therefore conclude the ISRB did not deny Bianchi due process when it rejected his claim.

We deny Bianchi's personal restraint petition.[9]

_Andrus, C.J._

WE CONCUR:

_Smith, A.C.J._          _Mann, J._

---

[9] Bianchi raises a number of issues which are fundamentally the same arguments he has raised on numerous occasions since at least 1988. A petitioner may not renew issues that were considered and rejected unless the interests of justice require relitigation of those issues. _In re Pers. Restraint of Lord_, 123 Wn.2d 296, 303, 868 P.2d 835 (1994). A personal restraint petition is not meant to be a forum for relitigation. _In re Pers. Restraint of Pirtle_, 136 Wn.2d 467, 491, 965 P.2d 593 (1998). Nor may a petitioner simply revise a previously rejected argument by alleging different facts or by asserting different legal theories. _Lord_, 123 Wn.2d at 329. We therefore decline to review any contention that his confession was unreliable or that the details of his crime were planted in his brain by experts during sessions of hypnosis, that the prosecutor violated his plea agreement by advocating for life sentences before the ISRB, or any of the other allegations he has raised in his former petitions. _See_ Cause Nos. 20920-5-I, 21853-1-I, 51299-4-I, 79451-1-I, 73394-5, and 76440-9.