IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) | No. 39748-3-III |
| | ) | |
| | ) | |
| | ) | |
| DONALD E. LAMBERT, | ) | PUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, A.C.J. — Donald Lambert petitions this court for relief from personal restraint after the Indeterminate Sentence Review Board (ISRB) denied his petition for release. Because the ISRB's decision fails to meaningfully apply RCW 10.95.030(2)(f)'s presumption of release, we grant Lambert's petition and direct the ISRB to grant Lambert a new hearing.

FACTS

OVERVIEW

In 1997, Donald Lambert pleaded guilty to one count of aggravated murder in the first degree. He committed the offense when he was 15 years old and on probation for another crime. The trial court imposed a mandatory life sentence.

In 2014, the legislature amended the aggravated murder sentencing statute and mandated the resentencing of all persons who had been previously sentenced as a juvenile for the crime of aggravated murder. RCW 10.95.030, .035(1). Soon after, Lambert was resentenced to an indeterminate term of 25 years to life.

In August 2007, Lambert stabbed another inmate with a knife. He pleaded guilty to assault in the third degree, and the trial court imposed the maximum standard range sentence of 365 days, to be served consecutively with his aggravated murder sentence.

Prior to his March 2023 early release date, Lambert began the process of petitioning for release. As part of this process, psychologist Dr. Lisa Robtoy evaluated Lambert and issued a 12-page report.

The ISRB conducted a hearing in July 2022, where it considered the arguments of Lambert's attorney along with the testimonies of Lambert and classification counselor (CC) Denise McMains. In an August 2022 decision, the ISRB denied Lambert's petition. In an effort to secure a new hearing, Lambert sent the ISRB a draft personal restraint petition. In response, the ISRB issued an amended decision again denying Lambert's petition.

FACTS SUBMITTED AT THE JULY 2022 HEARING

1. *Early childhood*

Lambert had a chaotic and unstable childhood that included alcoholic parents who were incarcerated for various criminal activities. His parents separated one year after his birth, after which he lived part-time with his mother and part-time with grandparents.

2

Lambert's mother was depressed, manic, and lived a party lifestyle. As a young child, Lambert lived in poverty, often went hungry, and was physically abused by his mother and her various boyfriends.

When Lambert was six or seven years old, his mother was involved in drug trafficking, and a shooting occurred in their home. His mother went to prison for two years. After his mother's release, she and Lambert lived in lower income neighborhoods where Lambert was exposed to drug use, criminal activity, and gangs. Lambert began engaging in criminal activities when he was about 12 years old.

### 2. *Prior offenses*

Child molestation, first degree: In 1994, when Lambert was 12 years old, he sexually abused a young girl. In December 1995, he pleaded guilty to molestation of a child in the first degree and was sentenced to 8 to 12 weeks in a detention facility. Lambert was paroled in May 1996 and placed on probation for 2 years.

Aggravated murder, first degree: In May 1997, 15-year-old Lambert and another teenager entered the house of an elderly couple and brutally shot the husband. *See Lambert v. Blodgett*, 393 F.3d 943, 949 (9th Cir. 2004). The wife ran for the phone and the two teenagers ran outside to reload their weapons. *Id.* As the wife called for help, both teenagers reentered the house and shot her multiple times. *Id.*

2007 assaults:  In January 2007, during a fight in the prison yard, Lambert approached one of the combatants and began punching him.

In August 2007, Lambert attacked a fellow prisoner with a knife because he believed the prisoner was about to violently attack him.  This was the offense, noted in the overview, for which Lambert pleaded guilty to assault in the third degree.

Soon after, Lambert dropped out of the Sureño gang.  Although this was known to prison staff, he remained housed among Sureño gang members until 2012.  During that period, prison staff knew Lambert was vulnerable to attacks from Sureño members.

2010 assault:  In January 2010, Lambert was involved in a fight with three Sureño gang members.  After guards ended the fight, Lambert kicked one of the gang members in the jaw.

Other infractions classified as "serious":

- May 2007 possession of tattoo paraphernalia

- October 2015 possession of cell phone containing pornography

- July 2019 possession of someone else's clothes

### 3. *Dr. Robtoy's psychological evaluation*

The purpose of Dr. Robtoy's evaluation was to provide a "fully-instrument supported evaluation" of Lambert to "assist the [ISRB] in determining the potential for re-offense, violence risk, [and Lambert's] capacity to function in a less restrictive

4

environment" so as not to pose an unacceptable risk to himself or the community. Am. PRP, App., Psychological Evaluation (PE), at 1.

Dr. Robtoy met with Lambert for three and one-half hours. Prior to this, she reviewed his electronic, mental health, and medical files. In her evaluation report, Dr. Robtoy set forth a detailed history of Lambert's childhood, education, prison employment, prison programs completed, and prison infractions.

A close review of Dr. Robtoy's report shows that Lambert's life has unfolded in three stages:

- Stage 1 (prior to Sept. 2007): Lambert belonged to a gang and engaged in criminal behavior, including child molestation when he was 12, aggravated first degree murder when he was 15, and numerous infractions while incarcerated.

- Stage 2 (Sept. 2007 - 2010): Lambert dropped out of the gang, but remained housed among gang members. During this time, Lambert committed only one assault, perhaps attributable to prison staff's decision to house him among his former gang.

- Stage 3 (2011 - present): Lambert has worked consistently, enjoyed positive work reviews, mostly stayed out of trouble, and refrained from criminal activity. During this stage, Lambert's "serious" infractions have

been limited to possessing tattoo paraphernalia, possessing a cell phone

containing pornography, and possessing someone else's clothes.

Resp. of ISRB, Ex. 1, Attach. C, at 6.

Based on the information obtained by Dr. Robtoy, including the results of seven

psychological tests she administered to Lambert, Dr. Robtoy concluded:

> Mr. Lambert [is] a moderate risk in terms of general recidivism. It is important to note that Mr. Lambert earned high scores only on risk assessments designed to measure static factors that will not change over time and are largely based on historical data. While those scores are important, as they have been shown to have predictive value in terms of a person's likelihood to recidivate, Mr. Lambert scored closer to low on risk assessments that consider dynamic factors, such as his current behavior and efforts toward change. *The SAPROF[1] estimated that Mr. Lambert possesses a high degree of protective factors which will certainly support his success if/when he is released to the community and are likely strong enough to adjust his overall risk rating to low.*
>
> It is this evaluator's clinical opinion that Mr. Lambert has addressed his criminogenic needs and he would be able to continue living a prosocial life in less restricted environments to include the community.

Am. PRP, App., PE, at 11 (emphasis added).

### 4. *CC McMains*

CC McMains told the ISRB that Lambert had completed prison programs

designed to assist him in controlling aggressive tendencies. CC McMains also testified

that Lambert had completed several vocational and educational programs. She said that

---

[1] Structured Assessment of Protective Factors.

Lambert was not a behavioral problem in the unit and that he has held prison jobs with good supervisor reports. CC McMains indicated Lambert had extensive community support, including housing and a possible employment opportunity. She added that the Department of Corrections' Juvenile Board did not believe Lambert needed to complete any additional programs.

THE ISRB'S FIRST DECISION

The ISRB's August 2022 decision highlighted crimes and offenses Lambert had committed in his distant past, many prior to 2007. Although the decision also noted Lambert's two 2007 assaults and his 2010 assault, it failed to acknowledge that the 2010 assault occurred during the time when prison staff continued to house Lambert among Sureño gang members, despite knowing Lambert had dropped out of the gang.

The ISRB's first decision does not reflect that the Board considered Dr. Robtoy's psychological evaluation nor does it even discuss Dr. Robtoy's recommendations. The decision, however, does accurately note that Lambert's descriptions of his 1994 and 1997 crimes do not align with corresponding police reports. The ISRB found that Lambert, more likely than not, would commit new criminal offenses if released on conditions, and the Board consequently added 48 months to his minimum term.

THE ISRB'S AMENDED DECISION

In its amended decision, the ISRB explained it amended its earlier decision so as to "incorporate a newly adopted Decision and Reason format." Resp. of ISRB, Ex. 1, Attach. C, at 1. The new format acknowledged, "RCW 10.95.030 . . . establishes a **presumption of release** unless rebutted by a preponderance of evidence." Resp. of ISRB, Ex. 1, Attach. C, at 2. The amended decision contained a short and accurate description of Lambert's 1997 index crime. It also described Lambert's 1994 crime (from the perspective of the police report, rather than Lambert's plea to molestation) and noted that Lambert was on probation when he committed the index crime. The decision then listed the evidence considered, including Dr. Robtoy's psychological evaluation, along with the tests she administered and Dr. Robtoy's conclusions.

Toward the end of the amended decision, the ISRB provided its reasons for denying Lambert's request for early release.[2] In conclusion, the ISRB stated, "After weighing the evidence, including the community custody conditions and any favorable evidence noted above, the Board finds by a preponderance of the evidence that Donald Lambert is more likely than not to commit a new crime if released with conditions that are designed to help better prepare him for a successful re-entry into society." Resp. of

---

[2] Because we find these reasons inadequate, we discuss them later, after setting forth the controlling law.

ISRB, Ex. 1, Attach. C, at 7. As it had in its initial decision, the Board added 48 months to Lambert's minimum term.

Lambert sought review of the ISRB's amended decision by way of this timely personal restraint petition.

## ANALYSIS

To succeed on a PRP challenge of an ISRB decision, a petitioner must show they are under unlawful restraint. *In re Pers. Restraint of Dyer*, 164 Wn.2d 274, 285, 189 P.3d 759 (2008). Lambert argues that the ISRB abused its discretion by failing to meaningfully apply RCW 10.95.030(2)(f)'s presumption of release. If true, this abuse of discretion would render Lambert's continued incarceration unlawful.

The ISRB abuses its discretion when it acts without consideration of or in disregard of the facts. *In re Pers. Restraint of Addleman*, 151 Wn.2d 769, 777, 92 P.3d 221 (2004). Disregarding the evidence and supporting its decision with speculation and conjecture also constitutes an abuse of discretion. *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 369, 139 P.3d 320 (2006).

Children are constitutionally different from adults for sentencing purposes. *In re Pers. Restraint of Dodge*, 198 Wn.2d 826, 838, 502 P.3d 349 (2022). Sentencing juvenile offenders to life in prison without the possibility of parole or early release constitutes cruel and unusual punishment in violation of the Eight Amendment to the

United States Constitution. *Id.* at 838-39. In recognition of this, our legislature has provided a process of redemption for juvenile offenders sentenced to lengthy prison terms.

One such process applies to persons convicted as a juvenile of our State's most heinous offense—aggravated first degree murder. RCW 10.95.030(2)(f) requires the ISRB to evaluate such persons for release after serving at least 25 years of confinement. Not later than 180 days prior to the expiration of the offender's minimum sentence, the ISRB must conduct an examination of the person to determine the person's parolability. RCW 10.95.030(2)(f).

"The board shall order the person released, under such affirmative and other conditions [it] determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released." RCW 10.95.030(2)(f). The board must give public safety considerations the highest priority when determining parolability and conditions of release. *Id.* "While the ISRB 'shall give public safety considerations the highest priority' . . . the consideration of public safety does not override the presumption of release . . . and is, in fact, related to it." *In re Pers. Restraint of Brooks*, 197 Wn.2d 94, 102, 480 P.3d 399 (2021).

The decision to release "turns on a 'discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done.'" *Dyer*, 157 Wn.2d at 363 (citation omitted) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 10, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979)). The decision must be forward looking, not backward looking, and must give dynamic factors more weight than static factors, such as crimes committed long ago. *State v. Delbosque*, 195 Wn.2d 106, 122, 456 P.3d 806 (2020). We now turn to the reasons the ISRB gave in its amended decision for rejecting Lambert's petition for release.

As one reason for denying release, the ISRB stated that Lambert "has a prior failure on supervision which increases his risk for future failures and indicates supervision conditions may not mitigate his risk for a future crime if released on conditions." Resp. of ISRB, Ex. 1, Attach. C, at 6. To support this assertion, the ISRB noted that Lambert was on probation when he committed the *1997* index crime.

We find this reason deficient. Specifically, it ignores our Supreme Court's directive while ignoring Dr. Robtoy's 2021 psychological evaluation. Our high court has directed the ISRB's inquiry to be forward looking, not backward looking, and to give dynamic factors more weight than static ones, such as crimes committed long ago.

11

*Delbosque*, 195 Wn.2d at 122. Dr. Robtoy's 2021 psychological evaluation determined that Lambert had an adjusted low risk to reoffend.

As another reason for denying release, the ISRB stated that Lambert's infractions since 2007 involved "either violence or weapons, a new felony conviction for assault on another inmate, gang related elements, [a] sex related element, a general inability to comply with the rules of the institution, or a combination of these factors." Resp. of ISRB, Ex. 1, Attach. C, at 6.

These second reasons also are deficient, as they reflect either embellishments or misstatements of the true facts. First, only one assault involved a weapon. Second, after dropping out of the Sureño gang, Lambert committed only one violent offense, the 2010 assault; and that assault could be attributed to the prison staff's decision to house Lambert with his former gang members. Third, the reference to "gang related elements" implies something false. It implies that Lambert had gang ties after 2007, when the opposite is true. Fourth, the "sex related element" comment implies that Lambert engaged in sexual misconduct, which he did not. In truth, Lambert possessed a cell phone that contained pornography.

These second reasons also ignored Dr. Robtoy's psychological evaluation and her opinion that dynamic and protective factors support adjusting Lambert's overall risk of

12

reoffending to low. Instead, the ISRB focused on static factors: Lambert's misconduct, almost all of which occurred more than 10 years before his early release hearing.

The presumption of early release under RCW 10.95.030(2)(f) does not require the ISRB to agree with or adopt the recommendations of an expert evaluator regarding appropriate conditions of release. *See Dodge*, 198 Wn.2d at 842-44. But neither is the ISRB free to disregard such recommendations and rely on conclusory statements about the offender's risk to reoffend. Instead, the ISRB must meaningfully consider the presumption of release and whether conditions of release would sufficiently mitigate the offender's risk level. *Id.* Here, the ISRB failed to do this. It disregarded Dr. Robtoy's recommendations and made conclusory statements about Lambert's risk to reoffend, while also erroneously focusing on static risk factors, almost all of which occurred more than 10 years before the early release hearing.

We grant Lambert's petition, reverse the ISRB's amended decision, and direct the ISRB to grant Lambert a new hearing and meaningfully consider Dr. Robtoy's psychological evaluation and the statutory presumption of release.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Staab, J.

Cooney, J.

13